No. 5          July 21, 2022          91

IN THE OREGON TAX COURT
REGULAR DIVISION

DEPARTMENT OF REVENUE,
State of Oregon,
*Plaintiff*,

*v.*

ALASKA AIRLINES, INC.,
*Defendant.*

(TC 5406 & 5407)

In these consolidated cases, the parties disputed the classification of three types of receipts under the special income tax apportionment formula for airlines of ORS 314.280 and OAR 150-314.280-(I). Defendant argued that the flight data from Horizon Air, a regional airline which was included on the same consolidated return as Defendant, should not be included in the departure ratio used to determine tax liability. Defendant also asserted that gross receipts from selling tickets for flights on aircraft operated by other companies (codeshare revenue) should not be included in "transportation sales" under OAR 150-314.280-(I). The court determined that, as part of the same consolidated group, Horizon Air's departures must be included in the departure ratio because, as a matter of law, the relevant factors are: (a) where flights operated by either company departed and (b) how much revenue was collected from their parties by either company. The court, after considering the text, context, and history of OAR 150-314.280-(I), further concluded that codeshare revenue was not for "transporting passengers" and therefore not "transportation sales"; the sales that produced the revenue were not made in Oregon and so were excluded from the numerator of Alaska's sales factor as nonflight sales. The court also considered an evidentiary issue regarding the codeshare agreement between Defendant and another airline and concluded that it was submitted untimely and did not add facts that would aid the court in reaching a conclusion.

Oral argument on cross-motions for summary judgment was held remotely on September 15, 2021.

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the motion and argued the cause for Plaintiff Department of Revenue.

Gregg D. Barton, Perkins Coie LLP, Seattle, filed the cross-motion and argued the cause for Defendant Alaska Airlines, Inc.

Decision rendered July 21, 2022.

**ROBERT T. MANICKE, Judge.**

In these consolidated cases,[1] the parties contest how three types of receipts must be classified as among the various components of the special income tax apportionment formula for airlines under ORS 314.280 and OAR 150-314.280-(I) as in effect for the calendar and tax years 2012, 2013, and 2014 (Years at Issue).[2]

## I.   FACTS

The following facts apply as of the Years at Issue and are stipulated unless otherwise indicated. Alaska was an Alaska corporation with its headquarters and commercial domicile in Seattle, Washington. Alaska's corporate parent, Alaska Air Group, Inc. (Air Group), was a holding company that owned all the stock of Alaska and all the stock of Horizon Air Industries, Inc. (Horizon).

Alaska was an airline that provided air transportation services to passengers to more than 100 cities in the United States (including Oregon), Canada, and Mexico. Horizon was a regional airline that generally serviced smaller airports throughout the Pacific Northwest, including Oregon, Washington, and Idaho. Alaska and Horizon each had their own Federal Aviation Administration (FAA) licenses and operating certificates; each operated flights that originated or terminated in Oregon. In accordance with Federal Aviation Administration rules, Alaska and Horizon were each required to maintain detailed statistics relating to their operations, including the number of departures from each airport served, the type of equipment used for each flight, and the number of passengers or weight of cargo carried on each flight.

Alaska entered into one or more capacity purchase agreements (CPAs) with Horizon for all of Horizon's seat capacity. Under the CPAs, Alaska purchased and paid

---

[1] As discussed in the Order of Consolidation dated November 6, 2020, each party essentially cross-appealed to this division from a Magistrate Division decision. The court refers to Defendant Alaska Airlines, Inc. as "Alaska" and to Plaintiff Department of Revenue as the "department."

[2] References to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to the 2011 editions, unless otherwise indicated. In 2016, as part of a general renumbering that disassociated tax OARs from specific sections of the ORS, the Secretary of State renumbered *former* OAR 150-314.280-(I) as OAR 150-314-0078, leaving the text unchanged.

Horizon for all the seating capacity on Horizon's flights for the Years at Issue. Horizon did not sell its own tickets. Alaska marketed, advertised, and provided all reservation and ticketing services with respect to all of the Horizon flight capacity.

Alaska and Horizon were members of the same unitary group and, together with Air Group, were included in the same consolidated federal returns for the Years at Issue. Alaska filed 2012, 2013, and 2014 consolidated Oregon corporation excise tax returns that eliminated the CPA revenue paid to Horizon by Alaska from income and from the sales factor.[3] On the originally filed returns, Alaska included the flight data of Horizon in the departure ratio used to determine Oregon transportation sales. On timely filed amended returns, Alaska removed the flight data of Horizon from the departure ratio, claiming an overpayment of tax.

The department issued a notice of deficiency on December 12, 2016, asserting that the flight data of Horizon must be included in Alaska's departure ratio, and that the departure ratio shown on the consolidated return must therefore be changed to 9.0671 percent, 9.6665 percent and 10.2722 percent for 2012, 2013, and 2014 respectively. If the flight data of Horizon is not to be included in the departure ratio shown on the consolidated return, the departure ratios are 6.0560 percent, 6.7397 percent and 7.5691 percent for 2012, 2013, and 2014 respectively.

The notice of deficiency also increased the amount of Alaska's "transportation revenue" by including certain "codeshare revenue." The notice stated: "It is gross revenue derived from airline ticket sales that is included as 'transportation revenue' regardless of whether the passengers who purchase those Alaska tickets ultimately fly on a plane operated by Alaska, or on a plane operated by another airline."

On or about December 4, 2017, the department issued notices of assessment and a conference decision letter

---

[3] The parties appear to disagree about whether the consolidated Oregon returns should have been filed under the name of Air Group as the corporate parent, rather than under Alaska's name. *See* OAR 150-317.710(5)(a)-(A). However, neither party asserts that filing the returns under Air Group's name would have changed the amounts at issue or the legal analysis.

upholding the determinations in the notice of deficiency. Alaska timely appealed to the Magistrate Division.

In addition to seeking *de novo* review of the departure ratio and transportation revenue issues determined in the notice of deficiency, Alaska asks the court to consider a third issue, not determined in the notice, pursuant to the court's authority under ORS 305.575. This third issue involves the treatment of amounts referred to as the "Bombardier subsidy," the facts of which are discussed below in the analysis of the issue.

## II.   ISSUES

A.   Are departures of aircraft operate by Horizon includible in the taxpayer's departure ratio?

B.   Are Alaska's gross receipts from selling tickets for flights on aircraft operated by other companies includible in transportation revenue?

C.   Are Horizon's gross receipts from the Bombardier subsidy includible in transportation revenue?

## III.   ANALYSIS

This case involves the special formula prescribed for apportioning to Oregon the business income of a company whose principal business is the transportation of goods or persons as an airline. As has been recounted in earlier cases, the Oregon legislature in 1965 adopted a generally applicable apportionment formula as part of the Uniform Division of Income for Tax Purposes Act (UDITPA). *See* ORS 314.605 to 314.675; *Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 302-306, 297 P3d 1256 (2013). However, UDITPA excludes airlines and other "public utilities" from its coverage; instead, the pre-UDITPA statute, ORS 314.280, governs determination of the net income of a multistate airline.[4] *See Fisher Broadcasting, Inc. v. Dept. of Rev.*, 321 Or 341, 348-359, 898 P2d 1333 (1995). ORS 314.280(1) provides that the department "shall have power to permit or require

---

[4] ORS 314.615 excludes a "public utility," as well as a "financial institution" or an individual rendering purely personal services. A "public utility" includes "any business entity whose principal business is ownership and operation for public use of any plant, equipment, property, franchise, or license for *** transportation of goods or persons ***." ORS 314.610(6).

either the segregated method of reporting or the apportionment method of reporting, under rules and regulations adopted by the department, so as fairly and accurately to reflect the net income of the business done within the state." The statute requires the department to conform its apportionment rules to the "weightings" in ORS 314.650, which for the Years at Issue means that property and payroll factors are ignored, and only the sales factor is used to determine Oregon's share of the business income of an airline. *See* ORS 314.280(3)(a); Or Laws 2005, ch 832, §§ 48, 48a (amending ORS 314.650; eliminating reference to property and payroll factors in apportionment formula).

Starting in 1983 and continuing through the Years at Issue, the department had in place OAR 150-314.280-(I) (Oregon Airline Rule), which the department adopted from a model regulation adopted in that year by the Multistate Tax Commission (MTC Airline Rule).[5] Section (1) of the Oregon Airline Rule refers to UDITPA, stating:

> "Where an airline has income from sources both within and without this state, the amount of business income from sources within this state is determined pursuant to ORS 314.610 to 314.665 except as modified by this rule."

Section (2) reiterates that business income of an airline is to be apportioned "using only the sales factor." That factor is defined in subsection (2)(d), which states:

> "The transportation sales derived from transactions and activities in the regular course of the trade or business of the taxpayer and miscellaneous sales of merchandise, etc., are included in the denominator of the sales factor. (ORS 314.665 and OAR 150-314.665(1)-(A)) Passive income items such as interest, rental income, dividends, etc., are not included in either the numerator or the denominator nor are the proceeds or net gains or losses from the sale of aircraft included. The numerator of the sales factor is the

---

[5] The as-adopted MTC Airline Rule is available at https://www.mtc.gov/ uploadedFiles/Multistate_Tax_Commission/Uniformity/Uniformity_Projects/ A_-_Z/SpecialRules-Airlines.pdf. The Oregon Airline Rule, both as of 1983 and as of the Years at Issue, is materially identical to the as-adopted MTC Airline Rule. The department made a nonsubstantive change in 2007, when it substituted the term "sales" in lieu of the original term "revenue" throughout the rule, apparently overlooking one usage of "transportation revenue" in the penultimate sentence of OAR 150-314.280-(I)(2)(d) as noted below.

total sales of the taxpayer in this state during the income year. The total sales of the taxpayer in this state during the income year is the result of the following calculation: The ratio of departures of aircraft in this state weighted as to the cost and value of aircraft by type, as compared to total departure [*sic*] similarly weighted, multiplied by the total transportation revenue.[6] The product of this calculation is to be added to any nonflight sales directly attributable to this state."

Definitions of key terms appear in subsection (2)(a), including the following:

"(J)   'Transportation sales' means sales from transporting passengers, freight and mail as well as liquor sales, pet crate rentals, etc.

"(K)   'Departures' means for purposes of these regulations all takeoffs, whether they be regularly scheduled or charter flights, that occur during revenue service."

In the Magistrate Division, the department offered a formulaic depiction of the sales factor, which the magistrate reprinted in her order:

$$\frac{\left(\left(\left(\dfrac{\textit{Weighted Oregon Departures}}{\textit{Weighted Total Departures}}\right) \times \textit{Transp. Revenue}\right) + \textit{Oregon Nonflight Sales}\right)}{(\textit{Transp. Revenue} + \textit{Miscellaneous Sales})}$$

The formula illustrates features that differ from the general UDITPA sales factor formula. The denominator is the sum of two items (total transportation revenue and "miscellaneous sales of merchandise, etc."), rather than UDITPA's single item of "total sales of the taxpayer everywhere." *See* ORS 314.665(1). Likewise, the numerator consists of two main parts rather than UDITPA's single item of "sales of the taxpayer in this state." *See id.* The first part of the numerator is a portion of total transportation revenue; this portion is determined by multiplying the total by the percentage of departures of aircraft in Oregon vs. departures everywhere.

---

[6]  The Oregon Airline Rule's use of "transportation revenue" here is an outlier; elsewhere, the rule refers to "transportation sales." The parties agree that the terms are synonyms for purposes of this case. In this order, the court generally refers to "transportation revenue"; for purposes of this case, the court uses "revenue" synonymously with "sales" and with "gross receipts." *See* ORS 314.610(7).

The second part of the numerator is "nonflight sales directly attributable to" Oregon. The numerator is the sum of the first and second parts.

The effect of this bifurcation of types of revenue in both the numerator and denominator is to "source" transportation revenue differently than under UDITPA. Whereas UDITPA requires the taxpayer to determine that an item of revenue is "in this state" before the item can appear in the numerator, the Oregon Airline Rule requires such item-by-item "sourcing" only for nonflight revenue. *See* ORS 314.665(2) (sourcing sales of tangible personal property based on destination of the property); ORS 314.665(4) (sourcing other types of sales by location of "income-producing activity" based on "costs of performance"). For an airline's transportation revenue, the Oregon Airline Rule uses the percentage of departures occurring in Oregon as a substitute for any other method of sourcing. *Cf.* OAR 150-314.280-(H)(3)(d) (railroads; applying ratio of miles traveled in state vs. miles traveled everywhere); OAR 150-314.280-(J)(3)(d) (trucking; similar).

A.   *Departure Ratio*

Alaska argues here, as it did in the audit, that the departure ratio should not include Horizon's departures from locations in Oregon. Alaska contends that, because Alaska and Horizon are separate corporations with separate FAA licenses and routes, each company's revenue should be multiplied by its separate departure ratio. However, as Alaska points out, because Horizon's revenue consists almost entirely of payments from Alaska under the CPA, Horizon's revenue is almost entirely eliminated under the federal consolidated return rules incorporated by ORS 317.710(5) and ORS 317.010(3)(a). *See generally StanCorp Financial Group, Inc. v. Dept. of Rev.*, 21 OTR 120 (2013) (discussing elimination under federal and Oregon law). It therefore is not possible to match Horizon's departures to Horizon's receipts because almost no Horizon receipts exist after elimination. And Alaska argues that it is inappropriate to use *Horizon's* departures to source *Alaska's* gross receipts.

The court rejects this argument as contrary to Oregon's treatment of corporations that join in a consolidated

return. Under the relevant statutes, Alaska, Horizon, and Air Group are a single taxpayer, and the special sales factor for airlines thus includes the aggregate departures for that single taxpayer, as well as the aggregate transportation revenue for that single taxpayer. The basis for this conclusion is as follows:

1.  The statute authorizing the Oregon Airline Rule applies "[i]f a *taxpayer* has income from business activity as a \*\*\* public utility \*\*\* taxable both within and without this state \*\*\*." ORS 314.280(1) (emphasis added).

2.  As used in ORS 314.280, "taxpayer" means a person subject to one of Oregon's net income taxes. *See* ORS 314.021 ("Except where the context requires otherwise, [ORS chapter 314] is applicable to all laws of this state imposing taxes upon or measured by net income.").

3.  ORS chapter 317 governs the particular net income tax at issue here, the corporation excise tax. That tax is imposed on "[e]very \*\*\* business *corporation* \*\*\* doing business within this state \*\*\*." ORS 317.070 (emphasis added).

4.  "Corporation" has a particular meaning for purposes of ORS chapter 317: "Whenever two or more corporations are required to file a consolidated state return \*\*\* *any reference in this chapter to a corporation* for purposes of deriving Oregon taxable income *shall be treated as a reference to all corporations that are included in the consolidated state return*." ORS 317.710(5)(c) (emphasis added).

Accordingly, when the Oregon Airline Rule states that the "total sales *of the taxpayer*" in Oregon is the "total transportation revenue" times "departures of aircraft in this state \*\*\* compared to total departure[s]," plus "nonflight sales directly attributable to this state," each term, by definition, refers respectively to the transportation sales, departures, and nonflight sales of "*all corporations that are included in the consolidated state return*," with intercompany items such as CPA payments eliminated. OAR 150-314.280-(I)(2)(d)

(emphasis added); ORS 317.710(5)(c) (emphasis added). It is therefore irrelevant for purposes of the departure ratio that Alaska and Horizon participated in a CPA by which Alaska sold all of the tickets for flights operated by Horizon. Regardless of any contracts between them, as a matter of law all that is relevant is (1) where flights operated by either company departed; and (2) how much revenue from third parties either company collected. Alaska's position would allow it to have its cake (by eliminating Horizon's CPA revenue) and eat it, too (by ignoring Horizon's departures when sourcing ticket revenue from third parties). With respect to this issue, the court will deny summary judgment to Alaska and grant summary judgment to the department. Based on the parties' stipulations, the court holds that the Oregon departure ratios that are required to be shown on the consolidated Oregon returns filed by Alaska are 9.0671 percent, 9.6665 percent and 10.2722 percent for 2012, 2013, and 2014 respectively.

B.   *Transportation Revenue*

The parties next dispute how Alaska's revenue from contractual arrangements that involve flights on aircraft operated by airlines *other than* Alaska and Horizon should be included in the sales factor. The parties' stipulations do not address the facts of these arrangements, but they are discussed in Air Group's Forms 10-K submitted as stipulated exhibits, and in uncontested portions of declarations of Alaska's tax director, Rebekah Funk.

1.   *Facts related to transportation revenue*

Alaska had two types of arrangements with companies not under common ownership with Alaska: CPAs with SkyWest Airlines, Inc. (SkyWest) and Peninsula Airways, Inc. (PenAir), and "codesharing" agreements or "marketing alliances" with more than a dozen domestic or foreign-based carriers, primarily Delta Air Lines (Delta) and American Airlines (American).

As to the CPAs with SkyWest and PenAir, the uncontested evidence before the court is that SkyWest and PenAir were independently owned and that Alaska's CPAs with them were "similar" to its CPA with Horizon. However,

in contrast to the CPA with Horizon for "100% of its capacity," the CPAs with SkyWest and PenAir were for "certain routes" only, and Alaska received all passenger revenue "from those flights."[7]

As to the codeshare arrangements, the following facts are uncontested and appear in the Funk declaration. Alaska derived codeshare revenue by making ticket sales and reservations to passengers for flights operated by other airlines such as American and Delta. Alaska collected the amounts paid by passengers for tickets sold and remitted those amounts to the airline operating the flight, net of a portion that Alaska retained. Most of Alaska's codeshare relationships were free-sell codeshares, where the marketing carrier sells seats on the operating carrier's flights from the operating carrier's inventory but takes no inventory risk. When another airline paid Alaska for a seat on one of Alaska's operated flights, Alaska treated that sale

---

[7] The court assumes for purposes of this order that the parties disagree about the treatment of Alaska's revenue from the SkyWest and PenAir CPAs. The department's counsel so stated at oral argument, but the written record is not entirely clear on that point. The department in its opening brief referred to the SkyWest and PenAir CPAs in its recitation of facts, as well as to the codesharing agreements and later argued generally that Alaska's ticket sales pursuant to "agreements with other airlines" are transportation sales. Alaska then filed its opening brief and included Funk's declaration, which includes seven paragraphs specifically describing the SkyWest and PenAir CPAs, stating that Alaska's returns treated all such revenue as nonflight revenue for purposes of the numerator of the sales factor, and that the returns sourced that revenue outside Oregon on the theory that the greatest proportion of Alaska's costs of performance with respect to that revenue was attributable to Washington, where Alaska's headquarters and call center agents are located. The declaration goes on to state facts specifically relating to Alaska's "codeshare revenue" in 14 subsequent paragraphs. Attached to the declaration are two sets of calculations: Exhibit D represents Alaska's position regarding the proper calculation of the sales factor and the proper amounts from Alaska's books and records. Exhibit E is "Alaska's understanding of the department's current position with respect to the proper calculation of the sales factor. The differences of opinion are found in the department's inclusion of codeshare revenue in the determination of transportation revenue ***. The parties disagree as to whether codeshare revenue is transportation revenue." The department then filed its response and reply, attaching a declaration of the auditor, Vivien Wrinn, which states: "I generally agree with the numbers in Exhibit E, with the exception of the Bombardier subsidy ***. I also disagree with the term 'commissions' used by Alaska in describing the transportation sales revenue derived from selling airline tickets under its code sharing agreements with other airlines." Exhibit E contains line items for "Alaska Transportation w/o Net Codeshare"; "Alaska Net Codeshare Revenue Incl. as Transportation"; and "Alaska Codeshare Commission," but Exhibit E nowhere refers to the capacity purchase agreements with SkyWest or PenAir.

as "transportation revenue" under OAR 150-314.280-(I). When Alaska paid another airline for a codeshare seat, Alaska treated the receipts it retained from the passenger as "miscellaneous sales" and "nonflight sales" under OAR 150-314.280-(I). Alaska sourced codeshare revenues outside Oregon for purposes of the sales factor numerator, applying cost-of-performance rules.[8] Thus, the numerator of Alaska's Oregon sales factor did not include codeshare revenue, but the denominator did.

### 2. *Parties' positions*

The department contends that all of Alaska's revenue from "agreements with other airlines," including the SkyWest and PenAir CPAs and codeshare agreements, is part of Alaska's transportation revenue because that revenue constitutes "sales from transporting passengers." OAR 150-314.280-(I)(2)(J) (defining transportation sales as "sales from transporting passengers, freight and mail as well as liquor sales, pet crate rentals, etc."). Alaska disagrees, arguing that transportation revenue includes revenue only from tickets on flights operated by Alaska.[9]

### 3. *Analytical framework*

In construing an administrative rule, the court applies the same analytical framework that applies to the construction of statutes. *State v. Hogevoll*, 348 Or 104, 109, 228 P3d 569 (2010). The court examines the text, context, and any relevant adoption history to determine the intent of the agency. *Otnes v. PCC Structurals, Inc.*, 367 Or 787, 794, 484 P3d 1049 (2021). The court's examination of text starts with the "plain meaning" of terms, for which general usage dictionaries are helpful, or technical sources such as specialized dictionaries if the drafters used technical terminology. *See Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295-96, 337 P3d 768 (2014). "Context" includes other provisions

---

[8] Alaska's stated rationale for applying cost-of-performance sourcing was that Alaska negotiated its codeshare agreements and carried out the activities associated with earning codeshare revenue at its headquarters in Seattle, Washington and through its call center agents, who were located in Washington, Arizona, and Idaho.

[9] More precisely, under the court's analysis above, on flights operated by the single taxpayer, *i.e.* either Alaska or Horizon.

of the same rule, other related rules, the statute pursuant to which the rule was created, and other related statutes. *Abu-Adas v. Employment Dept.*, 325 Or 480, 485, 940 P2d 1219 (1997). Dictionaries, and other sources of plain or technical meaning, or of context, should be contemporaneous with adoption of the rule, as the purpose of the court's analysis is to determine the intent of those who wrote the rule. *See Comcast*, 356 Or at 296, n 7, 299. In this case, as discussed, the Oregon Airline Rule originated in 1983, when the MTC approved the MTC Airline Rule as a model regulation and the department adopted it nearly verbatim.

4.   *Text*

A dictionary in common usage in 1983 defines the first sense of the verb "transport" as follows:

> "to transfer or convey from one person or place to another : CARRY, MOVE <on this vessel he ~ed a heavy load of ammunition -L.H,Bolander> <in the early days copper ore was ~ed in wagons -Amer. Guide Series Tenn.>"

*Webster's Third New Int'l Dictionary* at 2430 (1981) (*Webster's*).[10] The same dictionary compares various synonyms under the heading "carry," stating:

> "TRANSPORT refers to carriage in bulk or number over an appreciable distance and, typically, by a customary or usual carrier agency <how many merchants and carriers … must have been employed in *transporting* the materials from some of those workmen to others who often live in a very distant part of the country—Adam Smith> TRANSPORT is also used to signify the carrying of persons into very distant or strange spheres, especially by unusual instrumentalities <the astrophysicist with the aid of his spectroscope *transports* himself through millions of miles

---

[10] Other senses of the word convey, or add, a figurative meaning that the court does not find relevant here:

"2 : to carry away with strong or intensely pleasurable emotion: INFLAME, ENRAPTURE (his anger ~s him) (the test of greatness in a work of art is… that it ~s us -Herbert Read) (didn't realize that just a man and a red cloth and a bull could ... ~ a person -Barnaby Conrad) 3 : to convey or cause to be conveyed into banishment usu. to a penal colony <was eventually ~ed for stealing a gentleman's gold watch –Osbert Sitwell> 4 *Scot* a : to transfer (a minister) to another charge b : to remove (a parish church) to another part of the parish syn see BANISH, CARRY"

*Id.*

to worlds incredibly terrifying and beautiful—Waldemar Kaempffert>"

*Id.* at 343.

Based on these definitions,[11] the court concludes that the plain meaning of "transport" refers to the physical act of operating aircraft that move passengers or freight. Nothing in the plain meaning suggests to the court that acts such as advertising, promoting or selling tickets, or otherwise facilitating another person's movement of passengers or freight, constitute "transporting." The court turns to relevant context for any additional insights on the intention of the rule.

    5.  *Context*

For context, the court starts with the other terms in the sentence defining "transportation sales," namely, "liquor sales"; and "pet crate rentals, etc." OAR 150-314.280-(I)(2)(J). Pouring liquor and handling pet crates are physical activities. In the context of the Oregon Airline Rule, the court sees them as closely tied to the physical activity of operating the aircraft.[12] The court views "liquor sales" and "pet crate rentals" as activities incidental to the physical activity of "transporting passengers." The abbreviation "etc." means "and others esp. of the same kind" or "a number of various unspecified persons or things." *Webster's* at 779. The court concludes that the context of the entire sentence in OAR 150-314.280-(I)(2)(J) reinforces a conclusion that "transporting" refers to the physical activity of operating aircraft that move passengers because the sentence includes other physical activities incidental thereto.

The court next turns to the paragraph describing the contents of the sales factor, OAR 150-314.280-(I)(2)(d).

---

[11] A review of federal statutes and regulations in place in 1983 does not suggest any technical meaning that differs from the plain meaning in *Webster's*. *See*, *e.g.*, 49 USC § 1301(24) (1982) (defining "interstate air transportation" as "the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce" between specified United States destinations); 14 CFR §§ 200.1 to 399.111 (1983).

[12] In the absence of evidence, the court assumes that airlines in 1983 primarily made liquor sales during the flight or in airport lounges where passengers were waiting to board their flight. The court also assumes that airlines rented pet crates primarily to passengers whose pets were traveling with them on the same flight, or to persons wishing to ship pets as "freight."

Here the court finds two sources of revenue in the formula *other than* transportation revenue. Starting with the numerator, the only other term that refers to a source of revenue is "nonflight sales."[13] The drafters left that term undefined, and the court has not found a dictionary or other source that defines it. The plain meaning of the prefix "non" is "not : reverse of : absence of." *Webster's* at 1535. From that, the court tentatively infers that the drafters intended "nonflight" sales or revenue as a shorthand negation that means all revenue other than revenue from "transporting passengers, freight and mail as well as liquor sales, pet crate rentals, etc."[14] Turning to the denominator, the court reaches the same tentative conclusion as to the undefined term "miscellaneous sales of merchandise, etc." The plain meaning of "miscellaneous" is "comprising members or items of different kinds : grouped together without system : ASSORTED : HETEROGENEOUS." *Webster's* at 1442. The combined use of "miscellaneous" and "etc." renders the phrase as a whole so broad as to dilute the specific reference to "sales of merchandise." The court concludes that "miscellaneous sales of merchandise, etc." is a catchall for anything other than "transportation sales" and is thus synonymous with "nonflight sales." Overall, the context discussed in this paragraph does not change the court's initial conclusion that "transporting" refers to the physical act of operating aircraft that move passengers or freight.

Also within the paragraph describing the contents of the sales factor is the departure ratio: "The ratio of departures of aircraft in this state weighted as to the cost and value of aircraft by type, as compared to total departure[s] similarly weighted \*\*\*." OAR 150-314.280-(I)(2)(d). Departures of aircraft are a physical activity involving specific aircraft at specific locations. The court finds that the use of departures as the other multiplicand in the numerator supports a conclusion that "transporting," too, refers to

---

[13] Referred to as "nonflight revenue" in the MTC Airline Rule and in the Oregon Airline Rule before 2007.

[14] This inference is supported by the similarly binary approach found in the examples in both the Oregon Airline Rule and the MTC Airline Rule, which refer to "flight personnel" vs. "nonflight personnel," and to "747's ready for flight" vs. "nonflight tangible personal property." *See* OAR 150-314.280-(G) (example 1) (1983); MTC Airline Rule (example 1).

the physical act of operating aircraft to move passengers or freight, as opposed to selling tickets or otherwise facilitating another airline's transporting activities.[15]

Finally, the context of the Oregon Airline Rule also would include practices and models for generating revenue in the airline industry at the time the rule was drafted. The parties have supplied no evidence indicating that capacity purchase agreements or codesharing existed as of 1983. One-off ticket sales appear to have been common, however. The Ninth Circuit described the following scenario as of December 3, 1984: "Most of the world's airlines *** routinely sell carriage over each other's routes on a commission basis, pursuant to standard interline traffic agreements promulgated by the International Air Transport Association ***." *Kapar v. Kuwait Airways Corp.*, 845 F2d 1100, 1101 (1988) (rejecting personal injury claim against Pan American World Airways, Inc., which had issued ticket on its own ticket stock for successive flights provided by Kuwait Airways Corporation). But even if the court attributes knowledge of this "routine" practice to the drafters of the rules, their silence on the subject could support either party's position in this case. Therefore, the court assigns no weight to this context.

Overall, the court concludes that context from other portions of the Oregon Airline Rule, particularly the rule's references to "liquor sales" and "pet crate rentals, etc." as constituting "transportation sales," and the sourcing of receipts based on the location of departures and the value of aircraft used, are consistent with the plain meaning of "transporting passengers" as referring to the physical act of operating aircraft to move passengers. Before examining the adoption history of the rule, the court tentatively

---

[15] Alaska would have the court go further by concluding that the highly taxpayer-specific nature of the departure ratio (relying on the value, cost, tax basis of aircraft, etc.) implies that transportation sales must necessarily exclude revenue from sales commissions or other services to facilitate flights on other airlines. While the court agrees with Alaska's general proposition that "there must be a relationship under OAR 150-314.280-(I) between the departure ratio and the transportation sales to which it is applied," the court does not go so far as to hold that a future rule prescribing the same departure ratio would lack the requisite relationship if it required an airline to include commission and service revenue in a "transportation sales" multiplicand. The court expresses no view on that point.

concludes that revenue from Alaska's CPAs with SkyWest and PenAir and from codeshare agreements, was not revenue from "transporting passengers."

6.   *Adoption history of MTC proceedings*

For any additional indicia of the drafters' intent regarding the treatment of CPA and codeshare revenue, the court turns to materials compiled by the MTC related to its adoption of the MTC Airline Rule, which counsel for the department helpfully provided. *Cf. Powerex Corp. v. Dept. of Rev.*, 357 Or 40, 64-65, 346 P3d 476 (2015) (considering records of drafting of UDITPA in addition to looking to any relevant legislative history of Oregon legislature's later enactment of UDITPA).[16] These documents record a deep disagreement, over multiple years, between representatives of the MTC and representatives of the airline industry. From the perspective of the MTC's then-executive director, Eugene Corrigan, the dispute centered on the fact that airline routes commonly extend over states where the aircraft neither depart nor arrive and where the airline may or may not otherwise do business. (The record of proceedings generally refers to such states as "flyover" states.) According to Corrigan, the airlines initially proposed a single-factor "line-haul" formula that would have multiplied total net income by a fraction, of which the numerator was miles traveled over the arrival and departure states, and the denominator was miles traveled over all states on the route. The MTC objected because of a prevailing theory at the time[17] that flyover states would lack jurisdiction to impose an income tax on the airline, causing a substantial amount of "nowhere income":

"The problem * * * is that the airlines want to include all of their airtime in the denominator of their factors but that

---

[16] In this case, neither party supplied the court with any materials relating to the department's adoption of the MTC Airline Rule.

[17] The theory that a "flyover" state may not subject an airline to tax was articulated publicly in a meeting of the National Association of Tax Administrators in 1973. *See* Proceeding of the Annual Conference of the National Association of Tax Administrators 97-98 (1973) ("It was the consensus, although not the unanimous view, of the committee members, that pure fly-over operations alone (no landings or take-offs or other operations in the state) do not provide sufficient nexus to support an assertion of tax jurisdiction.") *quoted in* Jerome R. Hellerstein, Walter Hellerstein & Andrew Appleby, 1 *State Taxation*, (3d ed, 2022) at 10.03 n 113. The court today expresses no view about this jurisdictional topic.

they would exclude from the numerators of most states, even many of the states in which they admittedly do business, so-called flyover airtime. The result is that much of their income is not attributable to any state or other jurisdiction. We typically refer to such income as 'nowhere income.' For the purposes of this document, I refer to it as 'extraterrestrial' or 'E.T.' income."

Memorandum from Eugene Corrigan to MTC Executive Committee, July 12, 1983.

The MTC's approach, a version of which ultimately prevailed, sought to eliminate all "nowhere income" and instead to achieve "100% accountability." Minutes of Dec 6, 1982, hearing; statements of Corrigan. The as-adopted sales factor multiplies all transportation revenue by the departure ratio, which ratio does not use mileage flown, and thus altogether ignores flyover states and reflects only states where the airline's aircraft pick up passengers. A state from which an aircraft departs is highly likely to have jurisdiction to impose its income tax. *See generally* Jerome R. Hellerstein, Walter Hellerstein & Andrew Appleby, 1 *State Taxation*, (3d ed, 2022) ¶ 10.03[6][b] (discussing jurisdictional limitations). The departure ratio thus achieves the MTC's goal of "100% accountability," notwithstanding the airlines' objections that the ratio tends to overstate the contribution that states of departure (and arrival) make to the economic activity of the airline.

From this record, the court concludes that the drafters of the MTC Airline Rule were not concerned with sourcing revenue that airlines might receive from contracts with each other. The adoption history documents do not mention those activities. The court finds no indication that the drafters saw revenue from "transporting passengers" as anything other than revenue from carrying passengers on planes directly operated by the recipient of the revenue. Nothing in the adoption history changes the court's conclusion above.

The court pauses to discuss an argument the department makes based on the adoption history. The department asserts that Alaska's position would violate the drafters' intent by creating "nowhere income." This argument

seriously misuses the term "nowhere income." Abundant authority, including the Oregon Supreme Court's opinion in *AT&T Corp. v. Dept. of Rev.*, shows that the term refers to the possibility that apportionment rules might assign revenue to a state that *lacks jurisdiction to impose an income tax on the taxpayer.* 357 Or 691, 707, 358 P3d 973 (2015) (referring to "nowhere income" arising from sale of tangible personal property "when the taxpayer *cannot* be taxed in the purchaser's state") (emphasis added); *see also* Hellerstein, et al., 1 *State Taxation* ¶ 9.16[3] (referring to "nowhere income" as "income that is *taxable by* no state") (emphasis added); *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 US 307, 345, 102 S Ct 3103, 73 L Ed 2d 787 (1982) (O'Connor, J., dissenting) ("there is the disturbing possibility that no State could satisfy the *requirements of the Due Process Clause* as interpreted today by the Court, so that the contested income would be, in the words of state tax administrators, 'nowhere income.'") (emphasis added). The fact that a state having jurisdiction might *choose to not impose a net income tax* does not make the income so attributed into "nowhere income," so long as that state is not prohibited by the United States Constitution or a federal statute from imposing such a tax. *See* ORS 314.620(2) (taxpayer considered "taxable in another state" under UDITPA if the state "has jurisdiction to subject the taxpayer to a net income tax *regardless of whether, in fact, the state does or does not.*") (emphasis added).

Avoiding nowhere income was, indeed, a concern of the MTC, but the adoption history uses that term in the universally accepted sense, to refer to apportionment to states that lacked jurisdiction to tax, as was surmised to occur under the airline industry's line-haul proposal. Alaska's interpretation that revenue from the SkyWest and PenAir CPAs and from codesharing constitutes "nonflight sales" does not create nowhere income but instead sources that revenue to Washington, where Alaska is headquartered and has substantial operations. By misusing the term, the department appears to make the overblown argument that Alaska's interpretation is invalid simply because it results in revenue being assigned to a state other than Oregon.

Overall, the adoption history of the Oregon Airline Rule does not change the court's conclusion that revenue

from Alaska's CPAs with SkyWest and PenAir, and from codeshare agreements, was not revenue from "transporting passengers."

### 7. *Court's conclusions as to transportation revenue*

The court agrees with Alaska that its revenue from the SkyWest and PenAir CPAs does not constitute transportation revenue. The evidence is that the CPAs allowed Alaska to sell tickets to passengers for flights on airplanes operated by those airlines, not by Alaska. Alaska paid SkyWest and PenAir for the right to sell all such tickets on specified routes. Alaska retained the difference between the two amounts. Although neither party introduced either CPA into evidence, the parties do not dispute the foregoing essential terms.

As to Alaska's revenue from its codeshare agreements, the court reaches the same conclusion. Under the codeshare agreements, Alaska received revenue either from another airline or from a passenger buying a ticket. The department does not dispute that, when another airline paid Alaska for a seat on one of Alaska's operated flights, Alaska properly treated that sale as "transportation revenue" under OAR 150-314.280-(I). When Alaska paid another airline for a codeshare seat on a plane operated by the other airline, Alaska treated its receipts from the purchasing passenger as "nonflight sales" and "miscellaneous sales" under OAR 150-314.280-(I) and forwarded most of the revenue to the other airline. The department represented at oral argument that it considered only the amounts Alaska retained to be gross receipts.

The court concludes that amounts Alaska retained from the CPAs with SkyWest and PenAir, and from codeshare agreements, are not for "transporting passengers" and therefore are not "transportation sales." Those amounts are catchall ("nonflight" or "miscellaneous") items that must be sourced pursuant to the standard UDITPA rules. *See* MTC Airline Rule, § (1); OAR 150-314.280-(I)(1); ORS 314.665(4) ("Sales, other than sales of tangible personal property, are in this state if (a) the income-producing activity is performed in this state; or (b) the income-producing activity is performed both in and outside this state and a

greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance."). The uncontested facts are that Alaska incurred the greatest proportion of the direct costs of earning its revenues from the SkyWest and PenAir CPAs, and from the codeshare agreements, in Washington. The court thus concludes that these retained amounts are sales not within Oregon; they are nonflight sales that are excluded from the numerator of Alaska's sales factor; and they are included in the denominator of Alaska's sales factor as "miscellaneous sales of merchandise, etc."

8.  *Admissibility of codeshare agreement*

Before moving to the final substantive issue, the court addresses an evidentiary and procedural issue related to the dispute over transportation revenue. Approximately three weeks before oral argument, Alaska submitted an excerpt from its codeshare agreement with American specifying the percentage of "codeshare commission" revenue payable for different classes of tickets. On the day before oral argument, the department submitted the entire agreement. Alaska objects to the admission of the entire codeshare agreement for various reasons, including untimeliness and immateriality. The department urges that ORS 40.040 (OEC 106) compels its admission and that the entire agreement is relevant to show that "the codeshare passengers are the passengers of the Marketing Carrier (Alaska Airlines) not the Operating Carrier (American Airlines)."

The court has reviewed the entire codeshare agreement for the purpose of determining whether to admit it. The entire agreement undoubtedly fits within the standard of OEC 106, in the sense that it is a complete copy of a document of which an excerpt was admitted. That does not end the inquiry, however, because OEC 106 requires that the whole document be "otherwise admissible." The court therefore considers Alaska's timeliness and materiality arguments.

Regarding timeliness, the court starts by putting the department's filing in context. As is common in this division of the court, the parties, having gone through two administrative processes before the department, and

having litigated the case in the Magistrate Division, elected to develop the facts needed for this division by writing narrative stipulations and by stipulating to the authenticity of various documentary exhibits. This involved a process of informal exchanges of drafts and proposed exhibits, of which the court was aware from a series of case management conferences. The process culminated in the filing of a set of stipulations and exhibits on March 23, 2021, which the parties could then use in drafting their four briefs pursuant to the briefing schedule that the parties themselves negotiated and presented to the court for approval. As is also common, the parties provided additional evidence by declarations submitted with their briefs, in the form of witness testimony and exhibits. The court is of the view that this type of informal process of factual development, on a timeline agreed to by both parties, is generally efficient for both parties and for the court. It allows substantial flexibility that makes it easier for all concerned to focus on substantive issues as opposed to tactical procedural disputes. However, its effectiveness depends on parties deciding on their positions, and the factual basis therefor, within the agreed timeline. The submission of a new exhibit on the day before oral argument disrupts the process and thwarts its goals.

The department does not dispute that it never asked Alaska for a copy of a codeshare agreement until a few days before oral argument. The court is not required to admit the entire codeshare agreement in this circumstance. *See Nolan v. Jackson National Life Ins. Co.*, 155 Or App 420, 428, 963 P2d 162 (1998) (trial court did not abuse its discretion by rejecting affidavits submitted untimely, even if admitting them would not have prejudiced opposing party).

Regarding the materiality of the entire codeshare agreement, the court does not see that it adds facts that would help the court reach a conclusion.[18] *See, e.g., Black v. Nelson*, 246 Or 161, 164, 424 P2d 251, 253 (1967) ("The rule is that when a conversation or writing, in part, is received in evidence from one party, the remainder of the writing or

---

[18] For that matter, the court notes that it has not found a reason to refer to the *excerpt* of the codeshare agreement that Alaska submitted three weeks before oral argument. The department has not asked the court to exclude the excerpt, however; therefore, it remains in evidence.

conversation, to be competent, must be material, and affect in some way the part already given in evidence.") (internal quotation omitted). Unsurprisingly for an agreement between two publicly traded corporations, it is complex and multifaceted, but fundamentally it covers flights in which one airline is the "marketing carrier," and the other is the "operating carrier." The agreement defines "marketing carrier" as "the Party whose Code is shown in the carrier Code box of a flight coupon for a Codeshare Flight *but which is not the Operating Carrier.*" (Emphasis added.) The "operating carrier" is "the airline having operational control of an aircraft used for a given Codeshare Flight." The agreement thus clearly identifies which airline physically carries the passenger.

Focusing on the provisions raised by the department at oral argument, the agreement covers passenger service, ensuring that an operating carrier provides codeshare passengers "the same standard of customer service as it provides to its own passengers traveling in the same class of service," which standard must be "reasonably in accordance with" the Marketing Carrier's standard of service on its flights. It addresses training, generally requiring each party to "provide or arrange, at its own cost and expense, all initial and recurring training of its personnel to facilitate the Codeshare Flights and operations at airports served by the Codeshare Flights," including training on passenger service, reservations and sales activities and in-flight service. It includes indemnification provisions whereby, among other things, the operating carrier generally agrees to hold the marketing carrier harmless for certain damages due to personal injury of persons "being transported by *** the Operating Carrier" and the marketing carrier generally holds the operating carrier harmless for certain damages from passenger claims based on the marketing carrier's "failure to properly issue and complete transportation documentation ***." It establishes a joint management committee consisting of an equal number of representatives from each party, charged with overseeing and improving the transactions and relationships comprising the agreement.

The court finds nothing in these elements of the agreement that in any way alters the fact that only one airline operates the aircraft that moves any one passenger:

the "Operating Carrier." Contrary to the department's assertion, nothing in the agreement makes "the codeshare passengers *** the passengers of the Marketing Carrier (Alaska Airlines) not the Operating Carrier (American Airlines)." The fact that airlines see fit to conform their service standards within certain tolerances, train their own personnel in how to apply the agreement, and allocate risk in the event of lawsuits suggests, at most, that each airline wants to coordinate closely with the other in order to keep passengers on both airlines satisfied and to ensure repeat business for both parties. These facts are already clear from the existing record in Alaska's Forms 10K, which describe the benefits of codesharing and other airline "alliances," including "offering our customers more travel destinations and better mileage credit/redemption opportunities"; "giving us access to more connecting traffic from other airlines"; and making Alaska's mileage plan more valuable while also promoting Alaska flights by encouraging members of other mileage plans to earn miles on Alaska flights." The agreement does not somehow contractually convert American's passengers into Alaska passengers when American is the operating carrier, and the court does not see how it could. Rather, the agreement appears to have the unremarkable but important aim—also described in existing evidence—of filling more seats on flights operated by Alaska by making it easier for passengers to transfer from a leg flown by Alaska to other destinations conveniently and with a similar degree of comfort. The agreement also appears to fill seats on Alaska inbound flights, by making it easier for passengers originating from remote destinations on other airlines to make their final leg on Alaska or Horizon, with the added hope that those passengers will choose Alaska or Horizon on some future occasion.

C. *Bombardier Subsidy*

The final issue before the court is whether the Bombardier subsidy, a recurring payment to Horizon in the amount of $3,440,808.60 in each of the Years at Issue, was transportation revenue.[19] In briefing in this division, the

---

[19] Alaska refers to this amount variously as the Bombardier subsidy, the "fleet transition subsidy," or the "market transition subsidy."

department initially objected to any reduction in the amount of the deficiency on account of the Bombardier subsidy, contending that Alaska had not adequately substantiated the basis for a reduction; Alaska contended that the department had not requested substantiation. However, several weeks before oral argument, on August 25, 2021, Alaska submitted a Second Declaration of Rebekah Funk explaining that Horizon received the Bombardier subsidy amounts in consideration for Horizon's agreement to purchase certain aircraft from aircraft manufacturer Bombardier. Attached to the declaration are copies of relevant documents, including a "Contract Change Order" between Horizon and Bombardier Inc. describing terms of a "market transition subsidy" involving per-aircraft payments over a period of years. At oral argument, the department through counsel acknowledged in light of the declaration and exhibit that the Bombardier subsidy was not transportation revenue but was instead nonflight revenue. Because the sales factor provision in subsection (2)(d) of the Oregon Airline Rule does not specify how to determine whether an item of nonflight revenue belongs in the numerator, pursuant to subsection (1) of the Oregon Airline Rule, this determination must be made under the general rules of UDITPA. *See Pennzoil Co. v. Dept. of Rev.*, 15 OTR 101, 111 (2000) ("the court finds that *negotiating the Getty contract was an activity in the regular course of Pennzoil's unitary business*. Any income arising from that transaction or activity is business income apportionable under UDITPA.") (emphasis added), *aff'd* 332 Or 542, 33 P3d 314 (2001); OAR 150-314.665(4)(3)(a) ("Where the income producing activity in respect to business income from intangible personal property can be readily identified, such income is included in the denominator of the sales factor and, if the income producing activity occurs in this state, in the numerator of the sales factor as well.").

## IV.   ORDERS

Now, therefore,

IT IS ORDERED that, as to the "departure ratio" question discussed in Issue A, Defendant's Cross-Motion for Summary Judgment is denied and Plaintiff's Motion for Summary Judgment is granted;

IT IS FURTHER ORDERED that, as to the definition of "transportation revenue" discussed in Issue B, Plaintiff's Motion for Summary Judgment is denied and Defendant's Cross-Motion for Summary Judgment is granted; and

IT IS FURTHER ORDERED that, as to the Bombardier subsidy discussed in Issue C, Plaintiff's Motion for Summary Judgment is denied and Defendant's Cross-Motion for Summary Judgment is granted.

Costs to neither party.