IN THE OREGON TAX COURT
REGULAR DIVISION
Corporation Excise Tax

| | | |
|---|---|---|
| ABC INC. AND COMBINED AFFILIATES, | ) ) ) | |
| Plaintiff, | ) | **TC 5431** |
| v. | ) ) | **ORDER GRANTING PLAINTIFFS'** |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) ) | **MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR** |
| Defendant. | ) | **PARTIAL SUMMARY JUDGMENT** |

INTRODUCTION

Plaintiffs challenge the way Defendant interprets Oregon's "one taxpayer" law, which applies to a group of affiliates filing a consolidated Oregon corporation excise tax return. Plaintiffs argue that an exception, codified in the second sentence of ORS 317.715(3)(b), requires each affiliate to determine its own apportioned percentage of the group's overall income, while Defendant argues that a single percentage must be determined for the group as a whole.[1]

The point matters because Plaintiffs contend that some affiliates in the group are "interstate broadcasters," while others (such as Walt Disney Parks and Resorts U.S., Inc.) are

---

[1] Unless otherwise indicated, the court's references to the Oregon Revised Statutes (ORS) are to the 2007 edition.

not.  (*See, e.g.,* Ptfs' Decl of Schmidt at 2-4.)  A taxpayer that fits within the definition of "interstate broadcaster" must use a special apportionment formula that relies heavily on an "audience ratio" to attribute gross receipts from most types of activity--"more than just receipts from the activity of 'broadcasting'"--to Oregon in proportion to the share of overall audience in Oregon.  *Comcast Corp. v. Dept. of Rev.*, 363 Or 537, 545, 423 P3d 706 (2018); *see* ORS 314.680 to 314.690 (interstate broadcaster statutes).  If, as Plaintiffs argue, each affiliate must determine its own apportionment percentage, then an affiliate that does no broadcasting must use the standard, uniform attribution statutes, which generally look to the "destination" of sales of tangible personal property, and to the location of "income producing activities" for sales of services and intangibles.  For a theme park affiliate, all of these activities might be outside Oregon and result in no gross receipts attributable to Oregon.  But if, as Defendant argues, interstate broadcaster status is determined at the level of the group as a whole, then some portion of the gross receipts of all affiliates must be attributed to Oregon because the broadcasting activities of some affiliates cause the group as a whole to have an Oregon audience ratio greater than zero.

The parties present their competing interpretations of the second sentence of ORS 317.715(3)(b) in cross-motions for partial summary judgment, and the few facts needed to frame the issue are not in dispute.  Plaintiffs are parent corporation ABC, Inc., and subsidiary corporations that joined with it to file consolidated Oregon returns for the years at issue:  tax years ending October 3, 2009; October 2, 2010; October 1, 2011; and September 29, 2012. (Ptfs' Amend Compl at ¶¶ 1, 9; Def's Ans to Amend Compl at ¶ 1.)  By joining in consolidated Oregon returns, Plaintiffs took the position that the subsidiaries were (1) owned, directly or indirectly, to the extent of at least 80 percent by ABC, Inc.; (2) engaged in the same unitary

business as ABC, Inc.; and (3) like ABC, Inc., subject to Oregon's taxing jurisdiction. ORS 317.705(1) (defining "affiliated group" as under IRC § 1504); IRC § 1504(a) (generally defining "affiliated group" as 80-percent affiliates based on stock ownership); ORS 317.710 (5)(a)(requiring members of the same affiliated group to file a consolidated state return if they are members of the same "unitary group" and are subject to taxation in Oregon); ORS 317.705(2) (defining "unitary group" as a corporation or group of corporations engaged in a unitary business); ORS 317.705(3)(a) (defining "unitary business"). Plaintiffs have presented unrefuted evidence that at least one of ABC, Inc.'s 600 or more affiliates "did not derive gross receipts from the transmission of any one-way electronic signal by radio waves, microwaves, wires, coaxial cables, wave guides or other conduits of communications" and therefore would not be an "interstate broadcaster" if the definition were applied to that affiliate on a standalone basis. (Ptfs' Decl of Schmidt at 4 (referring to Walt Disney Parks and Resorts U.S., Inc.).)

Part I of this order presents legal background, by reference to prior decisions, on income attribution methods, consolidated returns, and the intersection of those concepts.

Part II applies the *State v. Gaines* framework to the second sentence of ORS 317.715(3)(b), enacted in 1984. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (defining Oregon's methodology to interpret statutes based on examination of text, context, and any relevant legislative history). Although neither the text nor the copious legislative history helps to resolve the dispute, the context supplied by other statutes persuades the court that the 1984 legislature intended the second sentence of ORS 317.715(3)(b) to preserve the separate computation of apportionment factors for each affiliate joining in a consolidated Oregon return, because that separate computation was necessary in order to apply the existing special apportionment methods applicable to a "business entity" constituting a "public utility" or to a

"financial organization." ORS 314.610(6); ORS 314.615. Nothing in the 1989 law adopting the interstate broadcaster statutes changes that conclusion. The *Gaines* analysis in Part II, therefore, supports Plaintiffs' position that the exception to "one taxpayer" treatment, in the second sentence of ORS 317.715(3)(b), applies. That exception requires each affiliate's status as an "interstate broadcaster," or not, to be determined separately.

Part III resolves five arguments, some of which are antecedent to the issue in Part II but are placed in Part III for the reader's convenience. None of these arguments disturbs the court's conclusion under Part II that Plaintiffs prevail.

- Defendant argues that the second sentence of ORS 317.715(3)(b) does not apply to the interstate broadcaster statutes at all, because those statutes are codified outside the series listed in the sentence. The court rejects this argument, concluding based on *Gaines* principles that the statutory series is a nonexclusive list that implicitly includes the interstate broadcaster statutes.

- Defendant argues that the conclusion in Part II would affect taxpayer reporting under other specialized attribution provisions, including the airline apportionment rule recently at issue in *Dept. of Rev. v. Alaska Airlines, Inc.*, 25 OTR 91 (2022) (*Alaska*). The court finds no basis in this argument to change the court's conclusion.

- Defendant argues that *Comcast* addresses the issues in Part II above. The court disagrees based on a review of the Supreme Court decision and the decisions of this court before and after remand.

- Plaintiffs argue that the use of "taxpayer" in the definition of "interstate broadcaster" supports the court's conclusion in Part II. The court rejects this argument for reasons set forth in *Alaska* and explained in the legal background in Part I.

- Plaintiffs present an alternative argument that the court should order their proffered apportionment methodology as relief under the "safety valve" provision in ORS 314.667. The court rejects this argument as moot.

The court will grant Plaintiffs' motion and deny Defendant's cross-motion.

## ISSUE

Must the determination whether to apply Oregon's interstate broadcaster apportionment methodology be made separately for each affiliate joining in a consolidated Oregon return, or for all such affiliates as a group?

## PART I: LEGAL BACKGROUND

This case involves two sets of statutes commonly involved in state income taxation of larger multistate businesses.[2] The court briefly describes the two sets, with reference to explanations elsewhere in case law. *See also generally* Jerome R. Hellerstein & Walter Hellerstein, I *State Taxation* ¶ 8.04 to 8.05 (reviewing allocation and apportionment); ¶ 8.11 (discussing states' approaches to reporting by multicorporate, unitary enterprises) (3d ed 2023).

A.     *Attribution of Income to Oregon (Allocation and Apportionment)[3]*

The first set of statutes, codified in ORS chapter 314, determines the items or portion of overall income that is subject to Oregon tax.[4] Within this set, the two main provisions are the

---

[2] When referring to a "multistate" business, the court includes business done within and without Oregon, whether in other states or internationally.

[3] The court uses "attribution" or "assignment" of income to Oregon as generic terms that encompass allocation, apportionment, or both in combination, as discussed below.

[4] As will be seen in Part I D, the placement of these statutes in chapter 314 reflects the need to apply attribution rules to any kind of multistate "taxpayer," regardless of whether that taxpayer is a corporation taxable under ORS chapter 317 or 318 or an individual, trust, estate, or beneficiary taxable under ORS chapter 316. *See* ORS 314.021 (ORS chapter 314 applies to all net income tax laws); ORS 317.070 (tax on corporations doing business in Oregon); ORS 318.020 (tax on corporations not doing business in Oregon but "deriv[ing income] from sources within this state"); ORS 316.037 (tax on residents); ORS 316.127 (tax on nonresidents).

uniform act known as UDITPA (adopted in 1965), which applies to taxpayers generally, and ORS 314.280 and Defendant's administrative rules thereunder, which apply to "public utilities" and "financial organizations" (later, "financial institutions"), as defined. *See* ORS 314.605(1) ("ORS 314.605 to 314.675 may be cited as the Uniform Division of Income for Tax Purposes Act."); *see generally Fisher Broadcasting, Inc. v. Dept. of Rev.*, 321 Or 341, 353-54, 898 P2d 1333 (1995) ("[T]he legislature, by subjecting most corporate taxpayers with income from within and without the state to the UDITPA presumption in favor of the apportionment method, while preserving ORS 314.280 for utilities and financial organizations, intended to maintain that more flexible and nonuniform regime for those taxpayers."); *Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 302-06, 297 P3d 1256 (2013) (discussing interaction between UDITPA and rules under ORS 314.280); *Powerex Corp. v. Dept. of Rev.*, 24 OTR 146, 148-50 (2020) (*Powerex II*) (outcome depended on whether taxpayer was a "public utility" or was required to use UDITPA).

A corporate taxpayer subject to either UDITPA or the rules under ORS 314.280 must first "allocate" specific items of "nonbusiness" income to Oregon, then "apportion" a percentage of its "business income" to Oregon. *See* ORS 317.010(10)(a) (first step to determine "taxable income or loss" is to subtract nonbusiness income or add nonbusiness loss); ORS 317.010(10)(b) (second step is to apportion result by apportionment percentage). The apportionment percentage is a fraction; the numerator is the taxpayer's "sales" in Oregon, and the denominator is its sales everywhere. ORS 314.650; ORS 314.665(1). This same fraction also is commonly referred to as the sales "factor."[5] A taxpayer applying UDITPA uses the sales factor codified in

---

[5] The term "sales factor" reflects the fact that, for tax years before 2005, the overall apportionment percentage required the computation of three such fractions: property in Oregon vs. everywhere (the property factor), payroll in Oregon vs. everywhere (the payroll factor), as well as sales in Oregon vs. everywhere. *See*

ORS 314.665; a "public utility" or a "financial organization" uses the sales factor specified in administrative rules under ORS 314.280.

A special sales factor adopted by the legislature in 1989 applies to any taxpayer fitting the statutory definition of an "interstate broadcaster":

> "'Interstate broadcaster' means a taxpayer that engages in the for-profit business of broadcasting to subscribers or to an audience located both within and without this state. The audience or subscribers ratio shall be determined by rule of the Department of Revenue."

ORS 314.680(3). "Broadcasting" is defined as "the activity of transmitting any one-way electronic signal by radio waves, microwaves, wires, coaxial cables, wave guides or other conduits of communications." ORS 314.680(1).

The special sales factor applies an "audience" or "subscriber" ratio:

> "(1) The sales factor for an interstate broadcaster shall be determined as provided in this section.
>
> "(2) The denominator of the sales factor shall include the total gross receipts derived by the interstate broadcaster from transactions and activities in the regular course of its trade or business, except receipts excluded under rules of the Department of Revenue.
>
> "(3) The numerator of the sales factor shall include all gross receipts attributable to this state, with gross receipts from broadcasting to be included as specified in subsection (4) of this section.
>
> "(4) Gross receipts from broadcasting of an interstate broadcaster which engages in income-producing activity in this state shall be included in the numerator of the sales factor *in the ratio that the interstate broadcaster's audience or subscribers located in this state bears to its total audience and subscribers located both within and without this state.*"

ORS 314.684 (emphasis added). Thus, as Defendant states in its administrative rule, an interstate broadcaster must apply the provisions of UDITPA, "as modified by ORS 314.684."

---

ORS 314.655 to ORS 314.660; Or Laws 2005, ch 832, §§ 48-49 (making sales the sole factor for apportionment).

OAR 150-314.686(1) (2009 through 2012). That "modifying" statute requires interstate broadcasters to use the ratio-based sales factor in lieu of the UDITPA sales factor in ORS 314.665.

In 2018, the Oregon Supreme Court resolved a key question regarding the special apportionment methodology for interstate broadcasters, holding that *all* gross receipts from transactions and activities in the regular course of an interstate broadcaster's trade or business-- "not solely receipts from 'broadcasting activities'"--are included in the numerator of the sales factor, in the ratio that the broadcaster's Oregon audience bears to its total audience.[6] *Comcast,* 363 Or at 551.

B.      *Consolidated Tax Returns for Affiliated Corporations*

The second set of statutes in this case governs consolidated returns for affiliated corporations. *See generally StanCorp Financial Group, Inc. v. Dept. of Rev.*, 21 OTR 120, 123- 26 (2013); *Costco Wholesale Corp. v. Dept. of Rev.*, 20 OTR 537, 540-45 (2012). The Oregon consolidated return regime was adopted in 1984 and requires (among other things) that the affiliated corporations have filed a consolidated *federal* return. Or Laws 1984, ch 1 (Spec Sess); *see also* Or Laws 1985, ch 802 (technical corrections). Under prior law, related corporations generally filed a "combined report," a state reporting method that was not based on federal law and that could include the income and apportionment factors of corporations formed under the laws of foreign countries. *See Oracle Corp. and Subsidiaries II v. Dept. of Rev.*, 24 OTR 359, 363-68 (2021) (describing combined reporting). The Governor and Defendant requested the 1984 act primarily in order to adopt a "water's-edge" regime, as federal law generally excludes

---

[6] Except receipts from sales of real or tangible personal property. ORS 314.680(2).

non-United States corporations from the consolidated return. *See id.; US West/Qwest Dex Holdings v. Dept. of Rev.*, 20 OTR 342, 346-48 (2011) (explaining pressure from foreign countries, international businesses, and Congress); *Cook v. Dept. of Rev.*, 23 OTR 107, 117-26 (2018) (describing 1984 transition from former system of combined reporting); HB 3029 (1984) (Spec Sess) ("Presession filed (at the request of House Special Committee on Revenue for Governor Atiyeh)").

C.      *Cases Involving Both Attribution of Income and Consolidated Returns*

The interaction of the two sets of statutes--attribution of multistate income reported on a consolidated return--is the subject of recent cases in this court. *See generally Apple Inc. v. Dept. of Rev.*, TC 5416, WL 275091 (Or Tax, Jan 24, 2024) (slip op at 8); *Alaska*, 25 OTR at 95-97; *Oracle II*, 24 OTR at 363-68.  Defendant would add to that list some or all of the decisions in *Comcast*, but this court disagrees, as discussed in Part III.C.

D.      *Oregon's "One Taxpayer" Law and Exception; Parties' Positions*

Oregon law generally treats affiliates joining in a consolidated Oregon corporation excise tax return as one corporation and thus as one taxpayer.  This general rule, which the court here calls the "one taxpayer" law, results from the application of three statutes to the umbrella term "taxpayer" used in ORS chapter 314.  As this court stated in *Alaska*:

> "'[T]axpayer' means a person subject to one of Oregon's net income taxes. *See* ORS 314.021 ("Except where the context requires otherwise, [ORS chapter 314] is applicable to all laws of this state imposing taxes upon or measured by net income.").

> "* * * ORS chapter 317 governs the particular net income tax at issue here, the corporation excise tax. That tax is imposed on '[e]very * * * business *corporation* * * * doing business within this state * * *.' ORS 317.070 (emphasis added).

> " * * * 'Corporation' has a particular meaning for purposes of ORS chapter 317: 'Whenever two or more corporations are required to file a consolidated state return * * * *any reference in this chapter to a corporation* for purposes of

deriving Oregon taxable income *shall be treated as a reference to all corporations that are included in the consolidated state return.*' ORS 317.710(5)(c) (emphasis added)."

25 OTR at 98. Applying this reasoning, this court in *Alaska* concluded that three affiliates that joined in filing a consolidated Oregon return (corporate parent Alaska Air Group, Inc. and its two subsidiaries Alaska Airlines, Inc. and Horizon Air Industries, Inc.) were "a single taxpayer" for purposes of applying the apportionment formula specific to airlines as provided in OAR 150-314.280-(I). *Id.* at 98.

An issue not raised by the parties or the court in *Alaska* is whether the second sentence of ORS 317.715(3)(b) requires an apportionment formula to be applied separately at the level of each affiliate:[7]

> "In the computation of the Oregon apportionment percentage for a corporation that is a member of an affiliated group filing a consolidated federal return, there shall be taken into consideration only the property, payroll, sales or other factors of those members of the affiliated group whose items of income, expense, gain or loss remain in modified federal consolidated taxable income after the eliminations required under subsection (2) of this section. *Those members of an affiliated group making a consolidated federal return or a consolidated state return shall not be treated as one taxpayer for purposes of determining whether any member of the group is taxable in this state or any other state with respect to questions of jurisdiction to tax or the composition of the apportionment factors used to attribute income to this state under ORS 314.280 or 314.605 to 314.675.*"

ORS 317.715(3)(b) (emphasis added).[8]

---

[7] The magistrate's decision in *Alaska* discusses the second sentence of ORS 317.715(3)(b), but the parties did not raise or discuss the issue in their briefing on appeal to this division. *Alaska Airlines, Inc. v. Dept. of Rev.*, TC-MD 180065N, 2020 WL 977060 (Or Tax M Div Feb 28, 2020) (appealed under Regular Division Case Nos. 5406 & 5407, consolidated under No. 5407). See further discussion of *Alaska* in Part III.B. below.

[8] The second sentence of ORS 317.715(3)(b) is sometimes referred to informally, and in the parties' briefing in this case, as Oregon's "*Joyce*" provision. In *Appeal of Joyce, Inc.*, the California State Board of Equalization determined that when members of a unitary group conduct business in a state, it is necessary to determine whether the state has taxing jurisdiction over each entity before determining the apportioned taxable income of the group. *In Re Appeal of Joyce, Inc.* (Nov 23, 1966), 1966 WL 1411, [1966-1976 Transfer Binder] Cal Tax Rptr (CCH), 203-525 (Cal Bd of Equal); *see also* Hellerstein & Hellerstein, I *State Taxation* at ¶ 9.18[1][h] ("In *Appeal of Joyce* the California State Board of Equalization (SBE) held that receipts from sales of goods shipped to California customers by a seller that was part of a unitary business conducted in a state, but was not itself taxable in the state because of Public Law 86-272, may not be included in the California sales factor."); *id*. at ¶ 9.18[1][h][iv]-

To a limited extent, the parties are in agreement that the second sentence of ORS 317.715(3)(b) is an exception to "one taxpayer" treatment. They agree that the sentence requires that the sales and other factors of an affiliate that is *not* taxable in Oregon must be removed from the numerator of the apportionment percentage of the group joining in a consolidated Oregon return. ORS 317.715(3)(b). (Ptfs' Post-OA Resp at 2-3 ("[A]ny member corporation without nexus is excluded from the consolidated return's apportionment factor numerators[.]"); Def's Post-OA Br at 6; Def's Post-OA Reply at 2 (addressing, in the second sentence of ORS 317.715(3)(b), "whether any member of the group is taxable in Oregon")).) The dispute is over whether the sentence gives any instruction to a group composed entirely of affiliates that *are* taxable in Oregon.

Plaintiffs argue that the second sentence of ORS 317.715(3)(b) requires each affiliate joining in a consolidated Oregon return to determine its own apportionment factor or factors, and that the apportionment percentage of the group filing that return is the sum of each affiliate's apportionment factor or factors. (Ptfs' Mot Part Summ J at 12-13.)[9] Accordingly, because ORS 314.680(3) requires an initial determination of whether the taxpayer "engages in the for-profit business of broadcasting," as a prerequisite to determining the amount of "gross receipts from broadcasting" under ORS 314.680(2), Plaintiffs argue that the second sentence of ORS 317.715(3)(b) requires that the engaging-in-broadcasting test be applied separately to each affiliate. (*Id*. at 8; Ptfs' Resp at 5; Ptfs' Post-OA Br at 8; Ptfs' Post-OA Resp at 3-4.) In

[viii] (discussing adoption or rejection of the *Joyce* rule in other states). The court finds it unnecessary to determine to what extent, if any, the holding in *Appeal of Joyce* overlaps with the second sentence of ORS 317.715(3)(b), and the court does not do so here.

[9] The court at times refers to this method of separately determining each affiliate's apportionment percentage as a "summation method" because the group's apportionment percentage is the sum of the percentages of each affiliate.

Plaintiffs' view, any affiliate not engaged in broadcasting must use UDITPA or one of Defendant's rules under ORS 314.280 to determine its apportionment percentage.

Defendant argues that the second sentence of ORS 317.715(3)(b) narrowly requires an affiliate-level determination of apportionment factors only for the purpose of removing Oregon sales or other factors of any nontaxable affiliate from the numerator of the overall apportionment percentage reported on the consolidated Oregon return. (Def's Post-OA Resp Br at 6-7.) According to Defendant, that sentence does not otherwise disturb the general rule under ORS 317.710(5)(c) that all affiliates that are taxable in Oregon are a single "taxpayer." Accordingly, in Defendant's view, if any one affiliate does any amount of "broadcasting," the special apportionment methodology for interstate broadcasters must be applied to all affiliates joining in the consolidated Oregon return. (Def's Reply at 2; Def's Cross-Mot Part Summ J at 2-4.)[10]

## PART II: *GAINES* ANALYSIS OF EXCEPTION TO "ONE TAXPAYER" TREATMENT OF AFFILIATES[11]

A. *Text*

The court readily finds the second sentence of ORS 317.715(3)(b) ambiguous. In

---

[10] The court at times refers to Defendant's position as requiring a "pooling method" because the group's apportionment percentage is determined without regard to the percentage of individual affiliates.

[11] The third step in the *Gaines* analysis, review of legislative history, has turned up no relevant material, despite the parties' commendable efforts. At the court's request, the parties supplied the court with documents and audio files comprising the legislative history of the act that created the second sentence of ORS 317.715(3)(b) in a one-day special session in July 1984. *See* Ct's Ltr, Jan 10, 2024. The parties later supplied materials from the 1984 interim committee hearings that led up to the July special session. The court appreciates the effort and expense entailed in this research. In the end, however, none of these materials reveals a clear expression of legislative intent relevant to the specific subject of the motions, and the parties' discussions in briefing acknowledge as much. Although Defendant argues that certain witness testimony and exhibits presented in 1984 committee hearings "support[] defendant's reading of the text of ORS 317.715(3)(b)," the court finds that these materials, at most, are noteworthy for their *omission* of any specific reading of the second sentence of ORS 317.715(3)(b). As Defendant acknowledges, "notably absent from the discussions and other materials is any discussion about apportionment." (Def's Post OA Br at 5 n 5; *see* Ptfs' Ltr, Mar 8, 2024, at 1.)

The parties also agreed that they had examined the legislative history of the 1985 technical corrections act

contrast to many problematic statutes, the ambiguity here does not reside in particular terms.[12]
The problem is that the second sentence of ORS 317.715(3)(b) contains some 70 words comprising several clauses, prepositional phrases, and conjunctions, with no internal punctuation or subparagraph markers. This makes it difficult to tell which strings of words relate to which others. After oral argument, the court issued a letter on January 13, 2023, asking the parties to present their respective interpretations in greater detail, including their reactions to two interpretations posited by the court. Plaintiffs presented the following interpretation, denoted by inserting italicized letters as clause markers:

> "'Those members of an affiliated group making a consolidated federal return or a consolidated state return shall not be treated as one taxpayer for purposes of determining *(a)* whether any member of the group is taxable in this state or any other state with respect to questions of jurisdiction to tax or *(b)* the composition of the apportionment factors used to attribute income to this state under ORS 314.280 or 314.605 to 314.675.'"

(Ptfs' Post-Hearing Br at 2-3 (quoting ORS 317.715(3)(b).)[13] Plaintiffs read the sentence as containing three parts:

> (1) A subject: "Those members of an affiliated group making a consolidated federal return or a consolidated state return";

---

but had found no relevant materials there. *See* Ct's Ltr, Jan 10, 2024.

 Defendant quotes witness testimony from proceedings before the 1989 legislature, but these passages do not come close to addressing the specific issue in the parties' cross-motions. (Def's Resp at 9-10.) The testimony refers to a "group of businesses" and to a "unitary group," but there is no reference to a group that includes some corporations that engage in broadcasting and others that do not. (*Id*. at 10.)

[12] The key term "apportionment factor" is defined by reference to UDITPA and ORS 314.280. ORS 317.010(10). While the meaning of that term is clear, its plural usage in the second sentence of ORS 317.715(3)(b) could be interpreted either in a manner that supports Plaintiffs' position (as a reference to the assemblage of each Affiliate's sales factor), or in a manner not relevant to either party's position (as a reference to the three factors--property, payroll, and sales--that every taxpayer was required to use as of 1984). Similarly, the plain meaning of "composition," as of 1984, was broad and did not distinguish between the "put[ting] together," "ordering," or "arranging" of one or more apportionment factors for a single affiliate or for a group of affiliates. *Webster's Third New Int'l Dictionary* 446 (unabridged ed 1981).

[13] Plaintiffs' interpretation is the same as the court's "Alternative 2." *See* Ct's Ltr, Jan 13, 2023, at 1.

ORDER GRANTING PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT  TC 5431

(2) A verb phrase: "shall not be treated as one taxpayer for purposes of determining"; and

(3) Two objects joined by "or" (as shown with added italics): "whether any member of the group is taxable in this state or any other state with respect to questions of jurisdiction to tax *or* the composition of the apportionment factors used to attribute income to this state under ORS 314.280 or 314.605 to 314.675."

(*Id.* at 3.) Under Plaintiffs' interpretation, the group of affiliates is not treated as one taxpayer for purposes of determining the composition of the apportionment factors, with the result that each affiliate must either apply the interstate broadcaster apportionment methodology, or not, depending on whether that affiliate fits the definition of "interstate broadcaster" in ORS 314.680(3).

Defendant presented the following interpretation, likewise denoted by inserting italicized letters as clause markers:

"'Those members of an affiliated group making a consolidated federal return or a consolidated state return shall not be treated as one taxpayer for purposes of determining whether any member of the group is taxable in this state or any other state with respect to questions of *[(a)]* jurisdiction to tax or *[(b)]* the composition of the apportionment factors used to attribute income to this state under ORS 314.280 or 314.605 to 314.675.'"

(Def's Post-OA Reply Br at 2 (quoting ORS 317.715(3)(b).)[14] Defendant explained: "In other words, both 'jurisdiction to tax' and 'composition of the apportionment factors' are the 'questions,' and both questions relate to whether any member of the group is taxable in Oregon." (Def's Post-OA Br at 1.)

The court finds neither reading persuasive based solely on the text. Both suffer from the fact that "taxability" in a state *is* a "question[ ] of jurisdiction to tax." *See* ORS 314.620(2) (a

---

[14] The court finds defendant's interpretation materially the same as the court's "Alternative 1." *See* Ct's Ltr, Jan 13, 2023, at 1.

taxpayer is "taxable in another state" if the other state "has jurisdiction to subject the taxpayer to a net income tax"). Thus, under Plaintiffs' reading, treating "whether any member of the group is taxable in this state or any other state with respect to questions of jurisdiction to tax" as an object unto itself appears to render "with respect to questions of jurisdiction to tax" surplusage. Defendant's reading fares no better, as Defendant nowhere explains why "determining whether any member of the group is taxable in this state or any other state" fails to answer all "questions of jurisdiction to tax."

The court concludes that the text of the second sentence of ORS 317.715(3)(b) does not provide clear guidance beyond the point on which the parties already agree: that unitary affiliates are not treated as a single taxpayer for purposes of determining whether any affiliate is taxable in Oregon. The court proceeds to context.

B.      *Context*

1.   *Reference to Taxability "In Any Other State"*

An examination of statutory context reveals a flaw in Defendant's position. Defendant argues that the only purpose of the second sentence of ORS 317.715(3)(b) is to allow an affiliate-by-affiliate analysis of whether the affiliate is taxable in Oregon, so that sales attributable to a nontaxable affiliate can then be removed from the numerator of the apportionment percentage of the remaining group. (*See* Def's Post-OA Br at 1 ("[B]oth questions relate to whether any member of the group is taxable *in Oregon*[.]") (emphasis added).) The court finds this narrow interpretation inconsistent with the text itself, because the sentence expressly prohibits treating affiliates as "one taxpayer" for purposes of determining whether any member is taxable in "any other state," not just in Oregon. Under UDITPA, and specifically ORS 314.620 and the "throwback rule" in ORS 314.665(2)(b), as in effect since 1965, an Oregon-based seller's

taxability in *another* state determines whether gross receipts from the sale of tangible personal property delivered into that state are included in, or excluded from, the Oregon numerator. Assuming the seller is taxable in Oregon and ships the property from Oregon, if the seller is taxable in the state of delivery the sales are excluded from the Oregon numerator (the "destination" rule). ORS 314.665(2)(a). If such a seller is not taxable in the state of delivery, the sales are "thrown back" to Oregon--included in the Oregon numerator. ORS 314.665(2)(b); *see* ORS 314.620 (defining when "a taxpayer is taxable in another state").[15]

The court finds this context significant because it shows that the legislature intended the second sentence in ORS 317.715(3)(b) to play a role in determining the apportionment factor of the *taxable* group that joins in the consolidated Oregon return, apart from--and regardless of any consequences that flow from--excluding the factors of affiliates *not* taxable in Oregon. To illustrate, assume a unitary group consisting of Affiliates A, B and C, all of which are manufacturers based in Oregon. Each ships its respective products from Oregon to customers in California. Affiliate A has a small research facility in San Diego and therefore clearly is taxable in California. However, if considered separately, neither Affiliate B nor Affiliate C has sufficient contacts or activity in California to be taxable there. On these facts, all of the affiliates would be treated as taxable in Oregon. Nonetheless, that conclusion alone is insufficient guidance to enable the group to file its Oregon return. The group also needs to know whether the fact that Affiliate A is taxable in California causes Affiliates B and C to also be taxable in California in order to know whether B's and C's sales into California are considered to be in Oregon under the "throwback" provision of ORS 314.665(2)(b). The phrase "taxable * * * in

---

[15] Sales to the United States Government, too, are "thrown back" to the state of shipping. *See* ORS 314.665(2)(a).

any other state" in ORS 317.715(3)(b) answers this question in the negative, with the result that sales of Affiliates B and C are "thrown back" to Oregon under ORS 314.665(2)(b).

This context thus adds a clue in favor of Plaintiffs' position: the legislature intended the second sentence of ORS 317.715(3)(b) to resolve at least one apportionment question that has nothing to do with removing from the numerator the factor or factors of an affiliate that is not taxable in Oregon. Even if all affiliates are taxable in Oregon, a determination must be made at the level of each affiliate selling tangible personal property regarding that affiliate's taxability in destination states in order to properly apply the throwback rule. This context does not, however, address whether the second sentence of ORS 317.715(3)(b) requires any apportionment decisions other than throwback to be made at the level of each affiliate. The court proceeds to additional sources of context.

### 2. *Pre-1984 Law*

#### a. Combined reporting

Context also includes the system of "combined reporting"--used in varying forms since the 1950s--which the 1984 legislature replaced with the current consolidated return provisions. *See* ORS 314.363(1) (1983) (in place from 1975 until repeal by 1984 legislature; authorizing Defendant to permit or require unitary corporations under common ownership of at least 50 percent to file combined report); *Caterpillar Tractor Co. v. Dept. of Rev.*, 289 Or 895, 901, 618 P2d 1261 (1980) (describing pre-1975 combined reporting under Defendant's administrative starting in "the 1950's").[16] The combined *report* was not a tax *return*. Rather, each corporation

---

[16] In addition to combined reporting, note that, from 1929 to 1975, a parallel regime of "consolidated returns" existed, but it was rarely used and the statute that allowed consolidated returns was not based on federal law. Defendant and its predecessor had discretionary statutory authority to require or permit corporations under at least 95-percent common ownership to file a consolidated return. *See* Or Laws 1929, ch 427, § 25; ORS 317.360 (1973); *see generally Caterpillar Tractor Co. et al v. Dept. of Rev.*, 8 OTR 236, 238 (1979) (discussing statutory history), *aff'd* 289 Or 895, 618 P2d 1261 (1980). Defendant apparently rarely used its authority to require or permit

subject to Oregon tax was required to file its own return, but if the corporation engaged in a

unitary, multistate business with one or more 50-percent affiliates it used a combined report form

or schedule to compute the information needed to complete its own separate return. *See* OAR

150-314.363-(B) (1983) ("If more than one corporate member of a unitary group is subject to the

tax jurisdiction of this state, then each such corporation ordinarily will file an Oregon return,

prepared on the combined report basis * * *."). Each corporation joining in a combined report

was required to determine its own apportionment factors. *See id.* ("[A]gainst the combined

business net income of the unitary business shall be applied a factor which ordinarily will be the

---

consolidated returns; relying instead on combined reporting pursuant to administrative rule, which survived until the 1984 act became effective. *Caterpillar*, 289 Or at 901 ("The legislative history reflects that ORS 317.360, enacted in 1929, was in desuetude. The Department had required combined reporting as an accounting method since the 1950's and did not use its discretion to permit or require consolidated returns as a taxing device."). The pre-1975 consolidated return law included a "one taxpayer" provision that was interpreted as absolute, in the sense that affiliates were treated as one taxpayer even for purposes of determining whether to apply the "destination" or "throwback" provisions that depend on the taxability of the "taxpayer" in the states from and to which goods are shipped. ORS 317.360 (1973) ("The corporations which are joined in a consolidated return shall be treated as one taxpayer."); *Caterpillar*, 8 OTR at 240 (stating affiliates sought to file consolidated return, apparently to benefit from one affiliate's taxability in states into which the other affiliate sold equipment but was not itself taxable); *see also* Reg. 7.360-(A) (1962) ("For the purpose of computing the income properly attributable to this state on a consolidated return, the corporations are considered to be one taxpayer."). The 1975 legislature repealed the consolidated return statute and enacted statutory authority for combined reporting. Or Laws 1975, ch 760; *see* ORS 314.363 (1983).

In an effort to be complete, the court adds that Defendant included a so-called "combined return" regime in the administrative rules it promulgated under the 1975 act, apparently a hybrid approach intended as a convenience. OAR 150-314.363-(B) (1983) ("If more than one corporate member of a unitary group is subject to the tax jurisdiction of this state, then each such corporation ordinarily will file an Oregon return, prepared on the combined report basis described above. However, to facilitate preparation of the returns, where two or more affiliated corporate members of a unitary group are subject to the tax jurisdiction of this state, permission may be granted by the department for the corporate members to join in the filing of one single Oregon combined return. * * * The single Oregon combined return is intended to relieve each corporate member from filing an Oregon return separately, where it otherwise would be required to do so. All other statutory provisions apply to each corporate member separately."). This combined return regime appears to have preserved separate computation of each corporate member's apportionment factors. *See id.* ("[T]he report [sic] shall reflect separately: (1) the Oregon property, payroll, and sales factor numerators of each affiliated corporate member * * *."); *see also* OAR 150-314.615-(E) (1971) (referring to "combined return," but likewise requiring that the "property, payroll and sales factors shall be determined separately by dividing the filing corporation's respective property, payroll or sales figure for Oregon by the 'everywhere' property, payroll or sales figure for the entire unitary group.").

The combined report regime (and its combined return variant) survived until the 1984 consolidated return statutes became effective. Oregon Laws 1984, ch 1, § 18 (Spec Sess).

average of the property, payroll, and sales factors as defined in ORS 314.655 to ORS 314.665 *of the corporation filing the Oregon return*. The property, payroll, and sales factors shall be determined separately by dividing *the filing corporation's respective property, payroll, and sales figure for Oregon* by the 'everywhere' property, payroll, and sales figure for the entire unitary group.") (emphases added).[17]  The court finds that the "summation" method for which Plaintiffs in this case contend is materially the same as the separate computation method prescribed by pre-1984 combined reporting law.

      b.      Treatment of "public utilities" and "financial organizations"

The court now considers whether the 1984 legislature intended to depart from the existing summation method when it adopted the new system of consolidated returns.  As discussed below, the court finds any such intention unlikely, based on the context supplied by the special attribution provisions for "public utilities" and "financial organizations" (later, "financial institutions" as noted below).

These special provisions, which for purposes of this order were materially the same in 1984 and in the years at issue here, require *all* multistate taxpayers to apply a two-step analysis to attribute income to Oregon.  First, under ORS 314.615, a taxpayer must decide whether it is a "public utility," a "financial organization," or neither of those things.  Second, depending on the result of that analysis, the taxpayer must apply the correct set of attribution provisions.  If the taxpayer is a public utility or a financial organization, the taxpayer is excluded from UDITPA

---

[17] The requirement to determine an apportionment percentage separately for each corporation in a combined report yielded a result apparently consistent with the practice advocated by a leading commentator. *See* Frank M. Keesling, *A Current Look at the Combined Report and Uniformity in Allocation Practices*, 42 J Tax'n 106, 109 (Feb 1975) ("after the portion of the income from the entire business which is attributable to the taxing state is determined, such amount must be further apportioned between the corporations doing business within the taxing state.  This can be done by using the [UDITPA] formula taking into account only the portions of each factor which are attributable to the taxing state.") (cited in *Caterpillar*, 289 Or at 895 and *Coca Cola Co. v. Dept. of Rev.*, 271 Or 517, 526, 533 P2d 788 (1975)).

and must instead use one of Defendant's attribution rules under ORS 314.280. *See* ORS 314.615 ("Any taxpayer having income from business activity which is taxable both within and without this state, *other than activity as a financial organization or public utility* or the rendering of purely personal services by an individual, shall allocate and apportion the net income of the taxpayer as provided in ORS 314.605 to 314.675. *Taxpayers engaged in activities as a financial organization or public utility shall report their income as provided in ORS 314.280 and 314.675.*") (emphases added). If it is neither of those things, the taxpayer must apply the attribution provisions of UDITPA. *See id.*

The first of these steps raises an issue analogous to that now before the court: Must the determination whether to apply the special attribution provisions for a "public utility" or a "financial organization" be made separately for each affiliate joining in a consolidated Oregon return, or for all such affiliates as a group? To resolve this, the court turns again to the *Gaines* framework, examining the statutory text and contemporaneous context relating to the meaning of each of the two terms, as those items would have been available to the 1984 legislature. Each term is statutorily defined.

The statutory definition of "public utility" encompasses a range of business activities, including communications, passenger or freight transportation, and the production and distribution or electricity or gas:

> "'Public utility' means any business entity whose principal business is ownership and operation for public use of any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, or the production, storage, transmission, sale, delivery, or furnishing of electricity, water, steam, oil, oil products or gas."

ORS 314.610(6) (last amended in 1965). The plain text requires an initial determination of the "principal business" of a "business entity." The court has not found the phrase "business entity"

in general or legal dictionaries existing in 1965 or 1984. The ordinary[18] and legal[19] definitions of "entity," as of 1965 and 1984, had to do with the independent existence of something. Nothing in these definitions suggests to the court that the Oregon legislature intended the singular term "business entity" to include a group of entities, such as a group of affiliated corporations. By way of context, the contemporaneous definition of "public utility" for purposes of regulating rates and prices also referred to a corporation in the singular.[20] The legislative history of

[18] The definition of "entity" in 1965 was:

"1a: BEING, EXISTENCE; *esp*: independent, separate, or self-contained existence <seeking to preserve their [*entity*] and individuality> <successfully maintain their tribal [*entity*]> <the policy of the government of the U.S. is to seek … to preserve Chinese territorial and administrative [*entity*]— G. F. Kennan> **b**(1) : the existence of something as contrasted with its attributes or properties (2) : the essence, fundamental nature, or real being of something <for some philosophers, actual *entities* are the ultimate facts of reality> **2**: something that has objective or physical reality and distinctness of being and character : something that has independent or separate existence : something that has a unitary and self-contained character <whether the common cold is an [*entity*] has been debated — *Yr. Bk of Med.*> <my thoughts were chiefly occupied with the idea of the train, that luxurious complete [*entity*] — Arnold Bennett> <the individual churches are considered independent and autonomous [*entities*] — *Current Biog.*> <sees Germany as a unified state, an [*entity*] rather than a regional confederation — *New York Times*> **3**: an abstraction, ideal conception, object of thought, or transcendental object : SUBSISTENT <such *entities* as love, reason, and beauty> <such *entities* as numbers, particularized relations, and chimeras are classified as subsistent but not existent — R. J. Butler>"

*Webster's Third New Int'l Dictionary* 758 (unabridged ed 1961). The definition was unchanged for 1984. *Webster's Third New Int'l Dictionary* 758 (unabridged ed 1981).

[19] As of 1965, *Black's Law Dictionary* did not provide a definition of "entity," although the definition of "corporation" included the word: "CORPORATION. An artificial person or legal entity created by or under the authority of the laws of a state or nation[.]" *Black's Law Dictionary* 438 (3rd ed 1933). By 1984, "entity" was defined as:

"A real being; existence. An organization or being that possesses separate existence for tax purposes. Examples would be corporations, partnerships, estates and trusts. The accounting entity for which accounting statements are prepared may not be the same as the entity defined by law. An existence apart, such as a corporation in relation to its shareholders."

*Black's Law Dictionary* 477 (5th ed 1979).

[20] ORS 757.005(1)(a) (1963) provided:

"[T]he term 'public utilities' means: (a) Any corporation, company, individual, association of individuals, or its lessees, trustees or receivers, that owns, operates, manages or controls all or part of any plant or equipment in this state for the conveyance of telegraph or telephone messages, with or without wires, for the transportation of persons or property by street railroads or other street transportation as common carriers, or for the production, transmission,

UDITPA does not address how to apply the definition of public utility to a group of related entities.[21]

The second defined term, "financial organization," means "any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, investment company, or any type of insurance company." OTR 314.610(4) (1983). Each of these entities is listed in the singular, suggesting that the legislature intended to test each affiliate to determine whether to apply the UDITPA attribution provisions.[22] As context, a description of an administrative appeal adjudicated by

---

delivery or furnishing of heat, light, water or power, directly or indirectly to or for the public, whether or not such plant or equipment or part thereof is wholly within any town or city."

[21] When UDITPA was drafted, from 1957 to 1959, the framers included what they considered generic definitions of "public utility" and "financial organization," but they intended that each state insert its own definitions conforming to the state's definitions used for regulatory purposes. *See* Minutes, proceedings in Committee of the Whole Uniform Division of Income for Tax Purposes act at 27, July 9, 1957 (statement of George V. Powell) available at https://www.uniformlaws.org/viewdocument/committee-archive-93?CommunityKey=f2ef73d2-2e5b-488e-a525-51be29fbee47&tab=librarydocuments. The 1965 Oregon legislature chose to retain the default definition supplied by the framers of UDITPA, with the modification that the business entity must conduct one of the listed activities as its "principal" business, apparently to align the definition with a regulatory exclusion for the provider of electricity to a "company town." *See* Testimony, House Committee on Taxation, HB 1003, Jan 22, 1965, Tape 1, Side 1 (statement of Carlisle Roberts) *discussed in Powerex II*, 24 OTR at 174-75. The discussion of the one-word change to the default definition does not address multiple, related corporations:

"Public utilities, as in Oregon law, are placed in a special category. 'Any business entity whose principal business is ownership and operation for public use of any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, or the production, storage, transmission' and so on. Now we changed one word in this. Under the Uniform Act, public utility means 'any business entity whose business is ownership * * *.' The reason we changed it to principal business is that in our curious state of Oregon you will find a large paper mill, for example, acting as a public utility for the town. But it's not its principal business. Under the Uniform Act, this would become a public utility and would be subject, somebody might argue, to the --a tax upon its--what we'd regard as its main business. So we made that one change."

Testimony, House Committee on Taxation, HB 1003, Jan 22, 1965, Tape 1, Side 1 (statement of Carlisle Roberts).

[22] During the first year at issue in this case, the 2009 legislature replaced the phrase "financial organization" in ORS 314.615 and 314.610 with "financial institution." Or Laws 2009, ch 403, §§ 1, 6. A "financial institution" is defined as "a person, corporation or other business entity" on a list consisting of 12 paragraphs that overwhelmingly refer to entities in the singular. This statutory amendment does not change the court's analysis in this case. As amended, the full definition in ORS 314.610 (2009) provides:

Defendant appears to confirm that the analysis of whether to apply "financial organization" rules for apportionment was made at the level of each affiliate. *See* Income Tax Abstract OF 2810 Dec Ruling 74-3 (Nov 4, 1974) (ruling that wholly owned subsidiary of a "Washington banking corporation" was not a financial organization, where subsidiary's business was "leasing of computers and other equipment"); *see also U. S. Bancorp v Dept. of Rev.*, 9 OTR 289 (1983) (parent bank was unitary with nonbank subsidiary that was engaged in "marketing computer output microfilm").[23]

---

"(4) 'Financial institution' means a person, corporation or other business entity that is any of the following:
"(a) A bank holding company under the laws of this state or under the federal Bank Holding Company Act of 1956, 12 U.S.C. 1841 et seq., as amended.
"(b) A savings and loan holding company under the National Housing Act, 12 U.S.C. 1701 et seq., as amended.
"(c) A national bank organized and existing as a national bank association under the National Bank Act, 12 U.S.C. 21 et seq., as amended.
"(d) A savings association, as defined in 12 U.S.C. 1813(b)(1), as amended.
"(e) A bank or thrift institution incorporated or organized under the laws of any state.
"(f) An entity organized under the provisions of 12 U.S.C. 611 to 631, as amended.
"(g) An agency or branch of a foreign bank, as defined in 12 U.S.C. 3101, as amended.
"(h) A state credit union with loan assets that exceed $50,000,000 as of the first day of the taxable year of the state credit union.
"(i) A production credit association subject to 12 U.S.C. 2071 et seq., as amended.
"(j) A corporation, more than 50 percent of the voting stock of which is owned, directly or indirectly, by a person, corporation or other business entity described in paragraphs (a) to (i) of this subsection, provided that the corporation is not an insurer taxable under ORS 317.655.
"(k) An entity that is not otherwise described in this subsection, that is not an insurer taxable under ORS 317.655 and that derives more than 50 percent of its gross income from activities that a person, corporation or entity described in paragraph (c), (d), (e), (f), (g), (h), (i) or (L) of this subsection is authorized to conduct, not taking into account any income derived from nonrecurring extraordinary sources.
"(L) A person that derives at least 50 percent of the person's annual average gross income, for financial accounting purposes for the current tax year and the two preceding tax years, from finance leases, excluding any gross income from incidental or occasional transactions. For purposes of this paragraph, 'finance lease' means:
"(A) A lease transaction that is the functional equivalent of an extension of credit and that transfers substantially all of the benefits and risks of the ownership of the leased property;
"(B) A direct financing lease or a leverage lease that meets the criteria of Financial Accounting Standards Board Statement No. 13; or
"(C) Any other lease that is accounted for as a financing by a lessor under generally accepted accounting principles."

[23] As additional context, the court notes that the use of the singular in the definitions of "public utility" and "financial organization" under ORS 314.610 contrasts with the definition of "company" in ORS 308.505(2) (1983).

Based on the text and context of the statutory definitions of "public utility" and "financial organization," the court finds it highly likely that the 1984 legislature would have understood those terms to apply to each legal entity separately, rather than to an entire group of related entities. The 1984 legislature did not change those definitions, and they remained materially the same for the years at issue here, except for the 2009 replacement of "financial organization" with "financial institution" as noted earlier. Defendant now asks the court to read the second sentence of ORS 317.715(3)(b) in a manner that, for the past 40 years, necessarily would have required a multicorporate taxpayer's status as a "public utility" or as a "financial organization" to be determined at the level of the entire unitary, affiliated group.

To illustrate why the court is skeptical that the legislature intended the second sentence of ORS 317.715(3)(b) to effect such a change, the court constructs an example, applying the statutes and administrative rules in place in 1983 and their materially similar counterparts in the years at issue.

Assume a unitary group that manufactures, sells, and delivers goods. The corporate parent makes goods and sells them to customers around the country. The sole subsidiary is a wholly owned trucking company, which the parent formed initially to deliver the parent's goods.

---

In the latter statute, the terms "person," "company, "corporation" or "association" share the same broad definition:

> "'Person,' 'company,' 'corporation' or 'association' means any person, *group of persons*, whether organized or unorganized, firm, joint stock company, association, cooperative or mutual organization, people's utility district, joint operating agency as defined in ORS 262.005, syndicate, copartnership or corporation [engaging in any lines of business or activities listed in ORS 308.515(1)]."

ORS 308.505(2) (1983) (emphasis added); *cf.* ORS 308.505(3) (2007) (materially the same). This definition applies not for income tax purposes, but for purposes of central assessment of property. However, the court considers the definition relevant because central assessment, too, uses formulary attribution to assign to Oregon a percentage share of the tax base of a unitary, multistate business. *See, e.g., PacifiCorp v. Dept. of Rev.*, __ OTR __ (July 17, 2023) (slip op at 82-91) (appeal pending) (summarizing case law and concluding that 16.4995 percent of overall property value was attributable to Oregon). The central assessment definition of "company" illustrates that the legislature is capable of referring expressly to a "group" when that is what it means.

Since then, the subsidiary has become successful as a common carrier exclusively engaged in the "transportation of goods," which is within the definition of a "public utility." ORS 314.610(6). Under Defendant's "pooling" method, the group would have to first decide whether "transportation of goods" is the "principal business" of the group as a whole. *See* ORS 314.615. If the principal business of the group as a whole is retailing, not transport, then the UDITPA sales factor provisions of ORS 314.665(4) would require the transportation revenues to be assigned to Oregon only if the "greater proportion of the income-producing activity * * * based on costs of performance" occurred in Oregon. This default standard under UDITPA for sourcing[24] of service revenues is open to a wide range of differing interpretations and seems likely to generate confusion as applied to transportation of goods. *See* Hellerstein & Hellerstein, I *State Taxation* at ¶ 9.20[2] ("Probably the most common administrative variations from the statutory formula occur with respect to the transportation industry, for which the traditional three-factor formula of property, payroll, and sales formula, as well as the more recent formulas emphasizing the sales factor and adopting market-based attribution rules, are ill-suited."); *see generally id.* at ¶ 10.1 (historical overview). The group would not be permitted to use Defendant's much more specific rule under ORS 314.280 for freight carriers, which (in line with other states' rules and the model rule of the Multistate Tax Commission) requires sales to be assigned to Oregon based on "revenue miles traveled within and without the state." OAR 150-314.280-(G)(1) (1983); OAR 150-314.280-(G)(2) (2007); OAR 150-314-0074 (2024) (renumbered in 2016); *see* CAL. CODE REGS. tit. 18, § 25137-11 (2007) ("The 'interstate ratio' is the ratio which the aggregate of the mobile property miles traveled in this state by units of

---

[24] The court uses "sourcing" to mean the analysis of whether a particular sale is "in this state" and thus is included in the numerator of the Oregon sales factor.

mobile property which are located within more than a single state during the year bears to the aggregate of the total mobile property miles traveled by such property everywhere during the year."); CAL. CODE REGS. tit. 18, § 25137-11 (2024) (same); Reg IV.18.(g)(3)(iv)(B) (Multistate Tax Commission, Special Rules: Trucking Companies, amended 1989) (sourcing interstate sales based on "ratio which the mobile property miles traveled by such movements or shipments in this state bear to the total mobile property miles traveled by movements or shipments from points of origin to destination.").

If the facts in this hypothetical example are reversed, such that the "principal business" of the group is determined to be transportation, then Defendant's freight carrier rule would appear to apply to all retail sales of goods, as the rule does not distinguish between transportation sales and other sales. *See* OAR 150-314.280-(G)(2) (2007) ("Sales are assigned to this state in the proportion that the revenue miles traveled within the state bear to the total revenue miles traveled everywhere."); OAR 150-314.280-(E)(2) (2007) ("'[S]ales' means all gross receipts and revenues included in the taxpayer's apportionable income."). As a result, neither UDITPA's "destination" provision nor its "throwback" provision would apply, and the sales of goods would be "assigned to this state in the proportion that the revenue miles traveled within the state bear to the total revenue miles traveled everywhere." *Id.* Assuming that other states would apply the UDITPA provisions to the sales of goods, those other states would continue to assign the *entire* amount of those sales to one state or another, while Oregon always would assign *some portion* of the sales to Oregon, a result that seems likely to lead to taxation of the same income by multiple states.[25]

---

[25] Applying modified apportionment factors in lieu of UDITPA factors does not always yield as stark a change as this example illustrates, because the modified attribution methods prescribed in Defendant's administrative rules under ORS 314.280 often incorporate by reference substantial portions of the UDITPA

The court finds it highly implausible that the legislature in 1984 intended the second sentence of ORS 317.715(3)(b) to require the results illustrated in the example. Under Defendant's interpretation, the second sentence of ORS 317.715(3)(b) would have created an immediate, and potentially substantial, change for enterprises conducting disparate activities through multiple affiliates that collectively are sufficiently cohesive to fit the definition of a "unitary" business. Such a change would not have been needed to further the legislature's goal of adopting a water's-edge regime, nor would it have been needed to conform to federal consolidated return principles (which do not address apportionment of income among states). Any net revenue consequence would seem to have been an unpredictable double-edged sword, as the reversal of the facts in the example illustrates. Meanwhile, the administrative cost to trade one set of apportionment rules for another, potentially less suitable set, would seem to adversely affect taxpayers and Defendant alike. Under Plaintiffs' interpretation, there would have been no such change.

3. *Defendant's 1985 Administrative Rule Interpreting ORS 317.715(3)(b)*

The court notes one additional development that falls outside a strict temporal understanding of the statutory context. In October 1985, a few weeks after the "technical corrections" bill modifying the 1984 consolidated return law became effective, Defendant adopted an administrative rule providing guidance specifically on ORS 317.715(3)(b). OAR 150-317.715(3)(b)(2) (1985). The rule provides in part:

/ / /

provisions. *Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 302-04, 297 P3d 1256 (2013) (stating Defendant's rules under ORS 314.280 "largely incorporate by reference the methods of apportioning business income established under UDITPA"). Nevertheless, the cases cited in Part I.A., including *Comcast* and *Powerex*, show that examples abound in which a change in the definition or application of apportionment factors has materially affected the amount of income attributed to Oregon.

"In applying the apportionment provisions of ORS 314.280 or 314.605 to 314.670, each corporation subject to the tax jurisdiction of Oregon must be considered separately."[26]

This rule provision, which remained in place for the years at issue, seems unambiguously to require an affiliate-by-affiliate determination of whether to apply the special attribution rules for unitary public utilities and financial organizations that join in the filing of a consolidated return under the 1984 law.[27] Because the rule was published after the legislature had acted, the court does not weigh the rule as a factor in the court's analysis of the legislature's intention, but the court sees the rule as detracting from the coherence of Defendant's argument.

C.    *Conclusion Based on* Gaines *Analysis*

The court finds Plaintiffs' interpretation of the second sentence of ORS 317.715(3)(b) the

---

[26] The full text of OAR 150-317.715(3)(b) (1985) states:

"(1) Each member of an affiliated group of corporations must be treated as a separate corporation for purposes of determining whether it is subject to the tax jurisdiction of Oregon. A corporation is subject to the tax jurisdiction of Oregon if it is 'doing business' in Oregon as defined under ORS 317.010(4) or has income from Oregon sources taxable under ORS 318.020.

"(2) In applying the apportionment provisions of ORS 314.280 or 314.605 to 314.670, each corporation subject to the tax jurisdiction of Oregon must be considered separately.

"Example: Corporations A, B and C are members of the same unitary group and file a consolidated federal return. Corporation C is 'doing business' in Oregon as defined under ORS 317.010(4) while Corporations A and B have no activities in Oregon. Since Corporation C is the only member of the affiliated group subject to the tax jurisdiction of Oregon, the Oregon property, payroll and sales included in the numerator of the apportionment formula are determined by applying the provisions of ORS 314.605 to 314.670 to the business activities of Corporation C. The denominator of the apportionment formula will include the total property, payroll and sales for Corporations A, B and C as determined by applying the provisions of ORS 314.655 to ORS 314.670. See OAR 150-314.665(6) and 150-314.665(6)(a) for an explanation regarding how ORS 317.715(3) and this rule work with the 'primary business activity' provisions of ORS 314.665(6).

"(3) The property, payroll, sales and other factors included in the apportionment formula of a consolidated Oregon return must be computed by eliminating transactions between members of the affiliated group filing the consolidated Oregon return. See OAR 150-314.650(9) regarding transactions between members of an affiliated group filing a consolidated Oregon return and related pass-through entities such as partnerships and S corporations owned by other members of that affiliated group."

[27] The quoted sentence stating that "each corporation subject to the tax jurisdiction of Oregon must be considered separately" remains the same, notwithstanding other amendments. In 2016, the rule was renumbered to OAR 150-317-0630(2) (2024).

more persuasive by far. The text is inherently problematic but could support either party's interpretation. However, the context provided by the "throwback" provision in UDITPA quickly establishes that Defendant's interpretation is overly narrow. And the fact that Defendant's interpretation would have implied a substantial change to prior law, affecting such major industries as communications, transportation, electricity and gas companies, and banking, makes Defendant's position hard to accept, in the absence of any conforming statutory changes to the UDITPA definitions of "public utility" or "financial organization," and with no legislative history on point. Defendant's administrative rule, adopted immediately after the law was settled, contradicts its position in this case. Plaintiff's interpretation posits no such change, which is consistent with the retention of the UDITPA definitions, the absence of discussion in legislative history, and Defendant's rule.

### PART III: PARTIES' OTHER ARGUMENTS

A.    *Significance of the Omission of ORS 314.680 to 314.695 in the Second Sentence of ORS 317.715(3)(b)*

Defendant argues that the second sentence of ORS 317.715(3)(b) does not apply in this case because, to the extent that the sentence addresses the "composition of the apportionment factors," the sentence applies only to factors "under ORS 314.280 or 314.605 to 314.675." According to Defendant, because the factor for an interstate broadcaster is codified in ORS 314.680 to 314.690, the second sentence of ORS 317.715(3)(b) cannot apply, and the general rule controls: all affiliates in the Group are a single taxpayer for apportionment purposes. (*See* Def's Cross-Mot Part Summ J at 1-2.) Defendant emphasizes that the legislature has amended ORS 317.715 several times since the 1989 enactment of the interstate broadcaster statutes, without ever amending the cross-reference to include them. (*See id.*) As above, the

/ / /

court applies the *Gaines* framework to Defendant's interpretation of the phrase "under ORS 314.280 or 314.605 to 314.675" in the second sentence of ORS 317.715(3)(b).

    1.  Gaines *Analysis: Did the legislature intend "under ORS 314.280 or 314.605 to 314.675" as an exclusive list?*

The first question is whether the legislature intended "under ORS 314.280 or 314.605 to 314.675" as an exclusive list. *See generally Crimson Trace Corp. v. Davis Wright Tremaine LLP*, 355 Or 476, 496-501, 232 P3d 980 (2014) (analyzing text, context, and legislative commentary to determine whether legislature intended narrative list of items in as exclusive). As with other parts of the sentence's text, the placement of the statutory cross-reference, without punctuation, opens the cross-reference to competing interpretations. For example, does "under ORS 314.280 or 314.605 to 314.675" (1) modify the general process of "attribut[ing] income to this state" in the immediately prior phrase, or does it (2) refer more specifically to "apportionment factors" a few words earlier, or could it (3) refer to the entire string of concepts after the word "whether" in the midpoint of the sentence? Because it is unclear which part of the sentence the statutory cross-reference modifies, the court concludes that the text does not shed light on whether the legislature intended the statutory cross-reference to be exclusive.

The court finds a contextual indication in the omission of the Multistate Tax Compact from the second sentence of ORS 317.715(3)(b). From the date of its enactment in 1967 until the legislature repealed and replaced it in 2013, the Compact was an alternative allocation and apportionment mechanism that taxpayers could elect. Throughout this time, it was codified in ORS chapter 305, well outside the statutory series cited in the second sentence of ORS 317.715(3)(b). ORS 305.655 (1989), Art III, § 1 ("Any taxpayer * * * whose income is subject to apportionment and allocation for tax purposes * * * may elect to apportion and allocate in accordance with Article IV."). Likewise, a statute implementing one provision of the

Compact was codified outside the statutory series. *See* ORS 314.705 (1989) (implementing right under Compact of certain taxpayers to elect to pay tax on percentage of gross in-state sales in lieu of allocation and formulary apportionment).[28] Under either party's interpretation of the second sentence of ORS 317.715(3)(b), the court is aware of no reason why the 1984 legislature might have intended to treat taxpayers electing under the Compact differently from those using the allocation and apportionment rules of ORS 314.280 or 314.605 to 314.670, nor have the parties offered any legislative history on that point. The court finds that the omission of the Compact suggests that the legislature did not intend the reference to "ORS 314.280 and 314.605 to 314.670" to be exclusive.

In any event, the court is not inclined to place significant weight on the precise scope of the statutory series as an indicator of legislative intent. Since Oregon's statutes were first codified in 1953, Legislative Counsel has been authorized to number, "[r]enumber," and arrange statutory cross-references without further action by the legislature. *See* ORS 173.160 (allowing Legislative Counsel to renumber, rearrange, change, delete, substitute, and correct items when preparing the ORS, without changing the meaning of any Act); ORS 173.010 (1953) (same). The 1989 legislature, in enacting the interstate broadcaster statutes, did not specify whether those provisions would or would not be made part of the series comprising UDITPA; the bill before the legislature merely stated that the interstate broadcaster provisions would be "added to and

---

[28] Although the Compact offered a largely self-contained apportionment methodology, until 1993 nothing in ORS 314.605 to 314.675 referred to it. One reason may have been that, during most of that time, Oregon's UDITPA and the Compact prescribed generally similar allocation and apportionment rules, including an apportionment formula consisting of three equally weighted factors. In 1993, after Oregon had begun to modify its version of UDITPA in favor of a formula more heavily weighted to the sales factor, the legislature enacted ORS 314.606, which provides that the statutory formula "shall control" in lieu of the Compact formula. *Health Net, Inc. v. Dept. of Rev.*, 362 Or 700, 732-33, 415 P3d 1034 (2018).

made a part of ORS chapter 314."  Or Laws 1989, ch 792, § 1.  The court, therefore, is reluctant to infer significance from the fact that Legislative Counsel chose to place them outside the UDITPA series.  *Cf. Hathaway v. B & J Property Investments, Inc.*, 325 Or App 648, 662, 531 P3d 152 (2023) ("Because the placement of the ORLTA statute of limitations in ORS chapter 12 was the result of an organizational decision by Legislative Counsel, and not legislative action adding the statute to and making it a part of ORS chapter 12, we cannot draw any legislative intention from the placement of ORS 12.125 within ORS chapter 12.").

2.   Gaines *Analysis: Are the interstate broadcaster statutes implicitly included in the reference to UDITPA?*

Having found no indication that the legislature intended its references to ORS 314.280 and 314.605 to 314.675 to be exclusive, the court now examines whether the legislature intended to include taxpayers using the interstate broadcaster statutes within the scope of the second sentence of ORS 317.715(3)(b).  To do that, the court examines the relationship between the interstate broadcaster provisions and UDITPA, based on the text, context, and any relevant legislative history of the interstate broadcaster statutes.[29]

Three provisions in the interstate broadcaster statutes refer expressly to ORS 314.605 to 314.675:

> "(1)  Notwithstanding any provisions of ORS 314.605 to 314.675 to the contrary, ORS 314.680, 314.684 and 314.686 shall apply to the apportionment of the income of an interstate broadcaster."

ORS 314.682(1).

> "(2)  Except as provided in subsection (1) of this section, all other provisions of ORS 314.605 to 314.675 shall apply to the apportionment of the income of an interstate broadcaster."

---

[29] The court notes that the text of ORS 314.686 is similar to the text of ORS 314.280(1), but the court assigns no particular significance to the resemblance for purposes of this inquiry.

ORS 314.682(2).

> "The provisions of ORS 314.680 to 314.688 are not intended to change the
> meaning of the terms 'income-producing activity,' 'sources within this state,'
> 'business activity' taxable in this state or 'doing business' in this state contained
> in this chapter or ORS chapter 317 or 318."

ORS 314.690.

The first two, ORS 314.682(1) and (2), declare that all provisions of UDITPA apply to

apportionment of the income of an interstate broadcaster, except to the extent that a provision of

UDITPA is "contrary" to ORS 314.680, 314.684 or 314.686. The court will examine below

which provisions of UDITPA may or may not be "contrary" to interstate broadcaster statutes.

As to the third, ORS 314.690, the court is struck by the declared intent to "not * * *

change" the meaning of four listed terms.[30] This formulation implies, rather than states, that the

usage of those terms in chapters 314, 317, and 318 carries over to the interstate broadcaster

statutes. By contrast, in each of the Oregon income tax chapters the legislature affirmatively

"adopts" or "incorporates" parts of other law, or the legislature positively declares that a term

"has the same meaning" as in a different body of law. *E.g.,* ORS 317.013 (portions of Internal

Revenue Code "are adopted by reference as a part of this chapter"); ORS 318.031 (ORS chapter

317 and other Oregon statutes "are incorporated into and made a part of" chapter 318);

ORS 314.011(2) ("As used in this chapter: (a) Any term *has* the same meaning as when used in a

comparable context in the laws of the United States relating to federal income taxes, unless a

---

[30] Three of the four terms listed in ORS 314.690 played key roles in UDITPA or ORS 314.280. Within the three chapters, "income-producing activity" was used only in UDITPA's sales factor statute. ORS 314.665(3) (1989). "Business activity" was used in ORS 314.280 and in UDITPA, as well as in the definition of "unitary group" under chapter 317. ORS 314.280(1) (1989); ORS 314.615 (1989); ORS 317.705(2) (1989). "Sources within this state" was used only in establishing the tax base under chapter 318. ORS 318.020 (1989). "Doing business" was defined in ORS 317.010(4) (1989) and was used in defining the tax base under ORS 317.070 (1989); however, the term also appears in UDITPA's provisions dealing with taxability in another state and the apportionment of net loss. *See* ORS 314.620(1) (1989); ORS 314.675 (1989).

different meaning is clearly required or the term is specifically defined in this chapter.")
(emphasis added); ORS 317.010(10) ("'taxable income or loss' *means* the taxable income or loss
determined * * * under * * * the Internal Revenue Code * * *" subject to modifications)
(emphasis added). The court finds that the phrasing of ORS 314.690 suggests that the 1989
legislature viewed UDITPA and ORS 314.280 as integrally related to the interstate broadcaster
provisions, rather than viewing the three sets of statutes as wholly separate bodies of law that
required explicit linking language to establish such a connection.

The court concludes that ORS 314.682 and 314.690 at least raise the possibility that the
legislature, by leaving the second sentence of ORS 317.715(3)(b) unamended after adopting the
interstate broadcaster statutes, did not intend to *exclude* the interstate broadcaster statutes from
the sentence, but instead viewed them as sufficiently integrated with UDITPA that the sentence's
reference to UDITPA implicitly *included* them. In other words, the legislature could have
intended the interstate broadcaster statutes as an overlay that is inseparable from UDITPA when
determining the composition of the apportionment factors used to attribute income of an
interstate broadcaster to the state.

To test both possibilities, the court reviews which provisions of UDITPA were not
"contrary" to interstate broadcaster statutes and thus continued to apply to interstate broadcasters
under ORS 314.682.

- Subsection (1) of ORS 314.605 allows ORS 314.605 to 314.675 to be cited as
  UDITPA, while subsection (2) requires the court to construe a subset of those statutes
  (ORS 314.610 to 314.667) so as "to effectuate its general purpose to make uniform
  the law of those states which enact it." In this case, the parties have not raised an
  issue of uniformity as to any statute; therefore, the court finds this provision not
  contrary to any part of the interstate broadcaster statutes. The provision thus applies
  in determining the composition of the apportionment factors of an interstate

broadcaster, to the extent that the interstate broadcaster provisions do not supplant the remaining provisions under UDITPA.

- As discussed, ORS 314.606 provides that UDITPA provisions control to the extent of any inconsistency with the Multistate Tax Compact, codified in ORS 304.655. The court sees nothing in this provision contrary to any part of the interstate broadcaster statutes.[31] The provision thus applies in determining the composition of the apportionment factors of an interstate broadcaster, to the extent that the interstate broadcaster statutes do not supplant the remaining provisions under UDITPA.

- ORS 314.610 defines terms used in UDITPA. The court sees no need to discuss definitions separately from the analysis of UDITPA's operational provisions.

- ORS 314.615 and 314.620 define the circumstance in which allocation and apportionment of income under UDITPA are required. Under ORS 314.615, the taxpayer must have income from "business activity" that is "taxable both within and without this state." ORS 314.620 defines when a taxpayer is "taxable in another state": when the other state has jurisdiction to impose a net income tax. Much or all of the content of ORS 314.615 and 314.620 appears to be expressly incorporated into the interstate broadcaster statutes by the cross-reference to those quoted terms in ORS 314.690. The court concludes, therefore, that ORS 314.615 and 314.620 do not conflict with the interstate broadcaster statutes.

- The next six provisions of UDITPA, ORS 314.625 through 314.645, govern "allocation," meaning the all-or-nothing assignment to Oregon of an entire specific item of "nonbusiness" income to Oregon based on that item's connection to Oregon. These six statutes say nothing about business income, or about apportionment, but

---

[31] Indeed, if ORS 314.606 were "contrary" to the interstate broadcaster statutes, broadcasters arguably would not be barred from using three-factor apportionment under Article III of the Multistate Tax Compact for years before the 2013 partial repeal of the Compact. *See* Or Laws 2013, ch 407, §§ 5-6; *see generally Health Net, Inc. v. Dept. of Rev.*, 362 Or 700, 707-08, 415 P3d 1034 (2018) (explaining taxpayer's right under Compact to "elect either set of apportionment formulas" and recounting 1993 enactment of ORS 314.606 to "eliminate[]" that ability). The court expresses no view on this issue.

direct multistate taxpayers to allocate nonbusiness income from rents and royalties (ORS 314.630), capital gains and losses (ORS 314.635), interest and dividends (ORS 314.640), lottery prizes (ORS 314.642), and royalties from patents and copyrights (ORS 314.645). Defendant takes the position by rule that these six statutes apply to interstate broadcasters. *See* OAR 150-314.686 (2009 through 2012) ("The allocation and apportionment provisions in ORS 314.610 to 314.670 as modified by ORS 314.684, are required for interstate broadcasters unless the application of those provisions does not fairly and accurately reflect the extent of the taxpayer's business activities in this state."). The court, therefore, concludes that the six statutes are not "contrary" to any provision in the interstate broadcaster statutes.

- The next statute in UDITPA is ORS 314.647, which declares that it is the policy of the legislature to "carry out a comprehensive review of business income apportionment whenever federal legislation changes the nexus standard for state imposition of taxes based on business activity within state borders." The court finds nothing in this statute contrary to any provision in the interstate broadcaster statutes.

- Next, ORS 314.650(1) provides: "All business income shall be apportioned to this state by multiplying the income by the sales factor." For tax years beginning before July 1, 2005, this provision prescribed a formula by which to combine the three property, payroll, and sales factors to reach a single, overall percentage that could be applied to business income. *See* Or Laws 2005, ch 832, §§ 48, 49; *Health Net, Inc. v. Dept. of Rev.*, 22 OTR 128, 134-35 (2015) ("The legislature * * * finally mov[ed] to a single sales factor in 2005. * * * ."). Not only is ORS 314.650 not contrary to the interstate broadcaster statutes, it is essential; the interstate broadcaster statutes define the sales factor but do not specifically instruct the taxpayer to multiply that factor by business income. *See* ORS 314.680 to 314.686. Similarly, ORS 314.655 and 314.660, which define the property and payroll factors for those few businesses that use those factors, are not "contrary" to the interstate broadcaster statutes but exist in parallel to them.

- Certainly, the sales factor statute in UDITPA, ORS 314.665, is largely contrary to the interstate broadcaster statutes, as ORS 314.684(1) and ORS 314.680(4) prescribe a unique ratio-based computation for all gross receipts other than receipts from sales of real or tangible personal property.

- The court turns to the two remaining provisions in UDITPA. ORS 314.670 provides a mechanism for use of an alternative method of allocation and apportionment if the methods under UDITPA "do not fairly represent the extent of the taxpayer's business activity in this state * * *." ORS 314.670(1). ORS 314.675 provides that a taxpayer's net operating loss "shall be apportioned in the same manner as the net income so as fairly and accurately to reflect the net loss of the business done within this state." These two statutes complement, rather than conflict with, the interstate broadcaster statutes, because ORS 314.670 and 314.675 provide essential guidance for which no counterpart exists in the interstate broadcaster statutes.

Based on this review, the court concludes that very little of UDITPA is contrary to the interstate broadcaster statutes. Only the UDITPA sales factor statute, ORS 314.665, is supplanted by the interstate broadcaster statutes. All other provisions of UDITPA apply to an interstate broadcaster, and the interstate broadcaster methodology could not function as a standalone income attribution regime without essential instructions found in the remaining provisions of UDITPA. An interstate broadcaster must turn to UDITPA to know whether to apply any factors in addition to the sales factor (ORS 314.650 and 314.606), how to identify and allocate nonbusiness income (ORS 314.625 to 314.645), how to apportion a net loss (ORS 314.675), and what to do when the statutory methods to attribute income fail to fairly represent the extent of the taxpayer's business activity in Oregon (ORS 314.670).

The court concludes that, to the extent that the reference to ORS 314.605 to 314.675 reflects legislative intent, as opposed to an organizational decision of Legislative Counsel, the legislature did not intend the reference as an exclusive list of all apportionment statutes covered

by the exception to "one taxpayer" treatment under the second sentence of ORS 317.715(3)(b). Furthermore, the interstate broadcaster statutes are not separate from, nor do they replace, all of UDITPA. An interstate broadcaster must look to many provisions of UDITPA in order to attribute its income to Oregon. For these reasons, the court rejects Defendant's position that the legislature, by referring to UDITPA (ORS 314.605 to 314.675), intended to omit the interstate broadcaster statutes (ORS 314.680 to 314.690) from coverage under the second sentence of ORS 317.715(3)(b).

B.      *Effect of Plaintiffs' Position on Other Industries; Consistency with* Alaska Airlines

Defendant argues that Plaintiffs' interpretation of ORS 317.715(3)(b) is inconsistent with the decision in *Dept. of Rev. v. Alaska Airlines, Inc.*, 25 OTR 91 (2022) and would "impact" apportionment under ORS 314.280 of airlines, railroads, and other special rules for public utilities:

> "[T]he special airline rule, adopted under ORS 314.280, will necessarily be impacted if the court construes ORS 317.715(3)(b) as requested by plaintiff, at least for those airline taxpayers having more than one corporate member. Similarly, other rules adopted under ORS 314.280 that rely on ratios to determine the amount of sales to include in the numerator for a taxpayer consisting of more than one corporate member would be impacted, including the special rule for railroads, which uses a miles traveled ratio and the special rule for trucking, which uses a mobile property miles traveled ratio."

(Def's Post-OA Br at 8; *see also* OA at 3:38-3:40.)

The court agrees that a logical consequence of Plaintiffs' position, and of the court's conclusion above, is that each affiliate in a unitary group joining in a consolidated return must compute its own sales factor, including an affiliate whose "principal business" is one of the "public utility" activities listed in ORS 314.610(6). As discussed, however, Defendant's published guidance suggests that this is not a surprising result. *See* OAR 150-317.715(3)(b)(2) (2009) ("In applying the apportionment

provisions of ORS 314.280 or 314.605 to 314.670, each corporation subject to the tax jurisdiction of Oregon must be considered separately.").[32]

C.      *Whether* Comcast *Addressed the Issues in This Case*

Defendant argues that the Supreme Court addressed the application of the interstate broadcaster statutes to affiliates joining in a consolidated Oregon return. (*Compare* Ptfs' Mot Part Summ J at 13-14; Ptfs' Resp at 2-4 (arguing that the *Comcast* decisions do not address the issue in this case) *with* Def's Resp at 6-9; Def's Reply at 9-11; Def's Post-OA Reply at 3-4 (arguing that they do).) This court disagrees. At oral argument in this court in *Comcast I*, there appears to have been conceptual-level "discussion of the possibility that some taxpayer might show that it engaged in multiple trades or businesses, only one of which was interstate broadcasting." *Comcast Corp. v. Dept. of Rev.*, 22 OTR 295, 299 n 6 (2016), *aff'd* 363 Or 537, 423 P3d 706 (2018). However, the taxpayer did not present this court with an issue for decision on that point. *See id.* ("Taxpayer in this case makes no assertion that it is such an organization of companies or activities * * *."). Nor did the taxpayer raise the issue of reporting on a consolidated return on appeal, except to argue unsuccessfully "that it is an 'absurd result' if the sales of businesses such as 'telephone companies, cell phone service providers, providers of music and online video services, Internet service providers, alarm companies, financial institutions and more' are apportioned under the 'interstate broadcaster' formula of ORS 314.684." *Comcast*, 363 Or at 551 n 9. On remand, this court addressed nine additional

---

[32] Defendant at one point objects that Plaintiffs' summation approach implies that the elimination of intercompany transactions would have to be undone, a requirement that Defendant claims "would make no sense." (Def's Resp at 2-3.) Beyond that comment, the parties have not developed the point in this division; as a result, the court expresses no view as to whether, or in what circumstances, the second sentence of ORS 317.715(3)(b) requires intercompany transactions to be eliminated for purposes of computing gross receipts for the sales factor. The court notes that the former combined report rules apparently required the elimination of intercompany transactions. OAR 150-314.363-(B) (1983) ("On any combined report schedule, the property, payroll, and sales factors will be computed eliminating intercompany transactions.").

issues on summary judgment or partial summary judgment, holding *inter alia* that the taxpayer had correctly computed the audience and/or subscriber ratio under ORS 314.684 and that certain dividends and gain from the sale of stock were constitutionally non-apportionable because the stock served no operational function in the taxpayer's business. *Comcast Corp. II v. Dept. of Rev.*, 24 OTR 250; 253-54; 261-75; 275-306 (2020). Once again, however, the taxpayer in those proceedings did not raise the issue advanced by the parties' cross-motions in this case. In summary, none of the three *Comcast* decisions cites, or invokes the terms used in, the consolidated return reporting regime.

D.     *Use of "Taxpayer" in Interstate Broadcaster Statutes as Support for Plaintiffs' Position*

In their early briefs, Plaintiffs argued that the singular term "taxpayer" in the interstate broadcaster statutes supported their position. (*See* Ptfs' Mot Part Summ J at 6-9.) However, as discussed in Part I.D., that umbrella designation under ORS chapter 314 has no special significance as applied to the corporation excise tax.

In recent letters to the court, Plaintiffs also argued that the 1989 legislature's understanding of the revenue impact projected for the 1989 act supports their position. (Ptfs' Ltr, Mar 8, 2024, at 1-2; Ptfs' Ltr, Mar 27, 2024, at 1.) The court finds this argument unpersuasive, and in any event, moot.

E.     *Plaintiffs' Request for Alternative Apportionment*

As an alternative argument, Plaintiffs invoke the "safety valve" provision in Oregon's UDITPA, ORS 314.667. *See generally* Richard Pomp, *Report of The Hearing Officer: Multistate Tax Compact Article IV* at 19-20 (Oct 25, 2013) (available at https://digitalcommons.lib.uconn.edu/cgi/viewcontent.cgi?article=1537&context=law_papers) (describing UDITPA counterpart provision as "a safety valve, allowing tax administrators and

taxpayers to smooth the rough edges of the apportionment and allocation provisions when applied to a particular transaction."). The court's conclusions above render Plaintiffs' argument for alternative apportionment moot.

## PART IV. CONCLUSION AND ORDER

The court agrees with Plaintiffs that the second sentence of ORS 317.715(3)(b) requires that a separate apportionment percentage must be computed for each affiliate that joined in filing the consolidated Oregon returns at issue. For that reason, the determination whether to apply Oregon's interstate broadcaster apportionment methodology must be made separately for each affiliate, and not for Plaintiffs as a group. Now, therefore,

IT IS ORDERED that Plaintiffs' Motion for Partial Summary Judgment is granted; and

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Partial Summary Judgment is denied.

Dated this 14th day of May, 2024.

5/14/2024 8:37:28 AM

**Judge Robert T. Manicke**